[No. 70834-7. En Banc.]
Considered May 6, 2004. Decided November 4, 2004.

*In the Matter of the Personal Restraint of* CECIL EMILE DAVIS, *Petitioner.*

648

652

656

658

*Gilbert H. Levy* and *Catherine A. Chaney*, for petitioner.

*Gerald A. Horne, Prosecuting Attorney*, and *John C. Hillman, Deputy*, for respondent.

IRELAND, J. — This is a personal restraint petition filed by Cecil Emile Davis, a prisoner under sentence of death. On February 6, 1998, a jury in the Pierce County Superior Court convicted him of premeditated murder in the first degree for the death of Ms. Yoshiko Couch, an elderly resident of Tacoma, Washington. The jury found aggravating circumstances of rape, robbery, and burglary, making Petitioner eligible for the death penalty. In the *penalty phase*[1] the jury recommended that leniency not be granted. The trial court, the Honorable Frederick W. Fleming, on February 23, 1998, sentenced Petitioner to death. This court affirmed his conviction and death sentence on direct appeal in *State v. Davis*.[2]

Petitioner now files this personal restraint petition, raising several issues, primarily focusing on ineffective assistance of counsel. In addition, Petitioner claims this State's death penalty scheme constitutes cruel and unusual punishment, and its postconviction procedures for capital cases violate due process. We affirm the Court of Appeals in the *guilt* phase, finding that Petitioner cannot establish prejudice from his counsel's decision not to object to his being shackled. Because of the overwhelming evidence of Petitioner's guilt, he cannot show there was a reasonable probability that, *but for* his counsel's deficient performance in failing to object, the outcome of the *guilt* phase would have been different. However, the prejudice to the Petitioner during a special sentencing proceeding cannot necessarily be overcome by objective and overwhelming evidence, and we grant the petition and remand for a new trial in the *penalty* phase.

---

[1] RCW 10.95.050.

[2] 141 Wn.2d 798, 10 P.3d 977 (2000).

## QUESTIONS PRESENTED

In this personal restraint petition, Petitioner raises 17 questions which we identify and discuss in the section captioned *"DISCUSSION."*

## STATEMENT OF FACTS[3]

On January 25, 1997, the body of 65-year-old Ms. Yoshiko Couch was found in the upstairs bathtub of her home in Tacoma, Washington. She was discovered lying on her back, with her legs apart, submerged in bloody water approximately five to six inches deep. Wet towels and clothing were piled on top of her head and chest areas emitting a strong chemical odor. She was not clothed from the waist down. The gold wedding band she had worn on her left ring finger was missing.

At approximately 2:30 in the morning on January 25, 1997, George Anthony Wilson (Davis's codefendant) and Keith D. Burks were outside Petitioner's residence owned by his mother, Ms. Cozetta L. Taylor, and located across the street from Ms. Couch's home. In the presence of Mr. Wilson and Mr. Burks, Petitioner said, "I need to rob somebody," as he looked in the direction of Ms. Couch's home. Petitioner was wearing brown suede gloves at the time. Shortly after that Petitioner said, "I need to kill me a motherfucker." Mr. Burks went inside the house, while Petitioner and Mr. Wilson remained outside.

About five or six minutes later, Mr. Wilson returned to Petitioner's residence, appearing wide-eyed and scared. According to Mr. Burks, Mr. Wilson told him he and Petitioner "went over there to rip the lady off, but [Petitioner] just kicked in the door and started beating on her and rubbing [her] all over." Mr. Wilson said the woman, identifying Ms. Couch as "the old woman across the street," was coming down the stairs and that Petitioner rubbed her

---

[3] The facts are substantially based upon those recited in our opinion in *Davis*, 141 Wn.2d 798.

breasts. He also stated that he left as soon as he realized what Petitioner was doing to the woman.[4]

In the early morning hours (between 3:30 and 4:00 A.M.) of January 25, 1997, Ms. Jessica Cunningham, Petitioner's 14-year-old niece who was sleeping at Petitioner's residence, awoke and attempted to locate Petitioner. Mr. Wilson and Mr. Burks were in the house, but she could not find Petitioner Davis.

Later that morning at approximately 11:00 A.M., Jack A. Schauf and his wife, Ms. Asako Schauf, arrived at the Couch residence. They entered the home after noticing the front door was ajar and damaged. After a cursory look around, they proceeded to check on Richard Couch, husband of Ms. Couch, whose bedroom was located downstairs because he was unable to walk up the stairs. Mr. Couch was disabled and partially paralyzed. Because he took prescribed medication to help him sleep, he was not aware of what happened in his home that morning. Mr. Schauf found the body of Ms. Couch in the upstairs bathroom adjacent to the kitchen.

Richard Couch was retired from the United States Army. His wife was a homemaker and his primary caregiver. She did all the household shopping and purchased groceries at military commissaries in Pierce County, from which she had recently purchased Kool Mild cigarettes and cans of Pepsi Cola for her husband, and small packages of meat and poultry, enough to feed two people. There were cans of Budweiser Light beer in the home at the time of Ms. Couch's death. She always had cash on her person, either in the inside pocket of her purse or in an envelope. The Couches kept to themselves and had no African American friends who visited their home.

Later that morning, after police officers arrived at the crime scene, Petitioner was in his kitchen looking out the window at the investigation across the street. Police officers

---

[4] Keith D. Burks made two statements to police officials. In his first statement, given the morning of January 25, 1997, he denied any knowledge of the event. On January 30, 1997 he gave another statement, which was recorded, relating the conversation he had with codefendant Wilson.

were talking to one of his neighbors, and Petitioner observed the neighbor point toward Petitioner's residence. He remarked, in the presence of his sister, Ms. Lisa Taylor, "that bitch is next."

Later that day, after police officers had visited Petitioner's residence, Petitioner asked his mother for some Comet cleanser because he wanted to do some cleaning. He obtained a different type of cleaning product and cleaned the downstairs area of the house. He threw some items into a trash bag in the backyard. He also at least twice washed the clothing he wore the night of January 24, 1997. That same day, Petitioner offered to sell a gold wedding band to his mother for $10. She declined and returned it to him. Ms. Lisa Hubley, his niece, observed him wearing a gold wedding band on his "pinky" finger. Petitioner was also observed to have in his possession cash, Kool Mild cigarettes, and cans of Coca-Cola, Pepsi Cola, and Budweiser Light beer. He cooked chicken from a package without a store brand-name on it. None of these items had been observed in his possession the day before on January 24, 1997.

Tacoma Police Department forensic specialist Ms. Toni Wentland collected hairs, fibers, and suspected blood from Ms. Couch's mattress and bedcovers. Another forensic specialist, Eric Berg, gathered several pieces of evidence at the crime scene, including a utility box housing the telephone and television cables located on the outer left front corner of the Couch residence; the telephone cable with cut marks indicating an attempt to cut the telephone line; a completely severed television cable; a container of Comet cleanser recovered from the east bedroom; a white powdery substance, believed to be Comet cleanser, scattered mainly throughout the upstairs area of the house; a damp sponge with a gritty white powdery residue found on the railing at the top of the stairs; a similar white powdery residue found on Ms. Couch's body below the waist; Ms. Couch's open purse, with no money in it, on the hallway floor outside the doorway to the southeast bedroom; and a sleeping bag with a large amount of biological tissue (blood clot) recovered from the bed in the southeast bedroom.

Forensic specialist Berg did a thorough forensic investigation of the upstairs bathroom where Ms. Couch's body was found. Although no fingerprints were recovered, he observed a glove print on the bathroom mirror, which in his opinion was left by a leather glove. Mr. Berg noticed a strong chemical odor in the bathroom and determined the odor was consistent with the household cleanser "Goof Off." A can of "Goof Off" was found on the bathroom floor at the base of the bathtub.

On January 27, 1997, Pierce County Associate Medical Examiner Roberto Ramoso, M.D., performed an autopsy on Ms. Yoshiko Couch. He concluded the cause of her death was asphyxia by suffocation and neck compression and also xylene toxicity. He estimated the time of death at approximately 3:00 A.M. the morning of January 25, 1997. Dr. Ramoso observed that portions of Ms. Couch's face and hands showed deformation of the skin and changes in the structure of the tissue underneath the skin, symptoms that were consistent with skin coming in contact with the chemical xylene. In addition, a whitish dried secretion found on the inside of her nostrils was consistent with inhalation of xylene through the nose with some xylene going into the nostrils. In Dr. Ramoso's opinion, the xylene in Ms. Couch's blood was most likely introduced by inhalation and skin absorption.[5] He also observed evidence of trauma to Ms. Couch's vagina, consisting of a laceration wound, approximately one and three-quarters of an inch long, caused by a hard object, not a penis, penetrating the vaginal wall.

The Washington State Patrol (WSP) Crime Laboratory examined hairs recovered from the crime scene and determined certain hairs had "Negroid" characteristics. Petitioner and George Anthony Wilson are African American. Control samples of pubic and head hairs from Ms. Couch, Petitioner and Mr. Wilson were compared with the hairs

---

[5] The Washington State Toxicology Laboratory analyzed the blood drawn from Ms. Couch, as well as pubic and head hair samples taken during her autopsy. The analysis revealed her blood contained 21.2 milligrams per liter of xylene.

recovered from the Couch residence. Results of a test of a hair sample, recovered from a bedspread found in the east bedroom, were inconclusive when compared to the hair samples provided by Petitioner and Mr. Wilson. Another sample, taken from the bedspread in the southeast bedroom, contained one hair that was microscopically similar to Petitioner's head hair sample indicating he could be considered a possible source of that hair. One hair from a third sample was determined to be microscopically similar to Petitioner's pubic hair sample. While Petitioner's hair samples did not specifically identify him as the source of the hairs recovered from the Couch residence, his hair samples could not be eliminated as a source. Mr. Wilson's hair samples were microscopically dissimilar.

The WSP Crime Laboratory also examined a pair of Petitioner's black tennis shoes. Chemicals commonly found in Comet cleanser were found on the shoes. Bloodstains were also found on Petitioner's left tennis shoe. His shoes were sent to the GeneLex Laboratory for DNA (deoxyribonucleic acid) testing, along with blood samples taken from Petitioner and Ms. Couch. The laboratory determined the blood found on the shoe was not Petitioner's but was consistent with Ms. Couch's DNA; 1 in 625 persons of Japanese/Asian descent would share this DNA type.

On January 28, 1997, Petitioner was arrested on an unrelated warrant and held in the Pierce County Jail. The next day, police officers executed a search warrant at Petitioner's residence. They recovered several items, including a carton of Kool Mild cigarettes and a package of meat from the freezer in his home with a label which read "$2.60 pork ham slice fresh" and a date of December 11, 1996. The Kool Mild cigarette carton did not have a tax stamp, which is consistent with such items sold at the military commissary located at Fort Lewis, Washington. The meat item was packaged and price-marked by the Fort Lewis Commissary.

Petitioner was not employed at the time of the incident. His mother, Ms. Cozetta Taylor, and his sister, Ms. Lisa Taylor, did the shopping for their household. No one in the family had military commissary privileges or smoked Kool Mild cigarettes.

Police officers searched a garbage bag located downstairs at the back of Petitioner's residence. The bag contained cigarette butts, a can of Pepsi Cola, a can of Coca-Cola, glass bottles of Olde English beer, cans of Budweiser Light beer and its carton, and Kool Mild cigarette butts, cigarette packs, and a carton. Two latent fingerprints were recovered from the garbage. One fingerprint was taken from an empty Budweiser Light beer carton and matched Petitioner's left ring finger. The second fingerprint, lifted from an empty Kool Mild cigarette carton, matched Ms. Couch's left thumb.

A few days after the incident, Petitioner told Ms. Kyllo A. Cunningham, his niece, that Ms. Couch was found with towels over her head. That information had not at that time been publicly released by the police.

While already in custody, Petitioner was arrested on the charge in this case on January 30, 1997. Sometime in early February, Petitioner had a conversation with another prisoner, Shelbey B. Johnson. Petitioner asked to read Mr. Johnson's newspaper because he had heard that "the newspaper's saying that [Petitioner] raped the old bitch, . . . that I may have killed her, but I didn't rape her." Petitioner said he would file a lawsuit against the newspaper if it falsely stated he raped the woman.

On February 3, 1997, Petitioner was charged by information in the Pierce County Superior Court with aggravated murder in the first degree and, in the alternative, murder in the first degree. The aggravated circumstances included the allegation that the murder was committed in the course of the crime of robbery in the first or second degree, and/or rape in the first or second degree, and/or burglary in the first or second degree or residential burglary. A notice of intent to seek the death penalty was timely filed on June

10, 1997. The information also charged codefendant George Anthony Wilson with murder in the first degree.

The case was preassigned to the Honorable Terry D. Sebring on February 11, 1997. Pretrial motions were heard before Judge Sebring beginning on June 24, 1997, and the trial began on November 3, 1997. Judge Sebring became ill during voir dire examination of the jury. Petitioner objected to his replacement by another judge. On November 13, 1997, the Honorable Frederick B. Hayes granted a mistrial. A new trial began with jury selection on January 5, 1998 before the Honorable Frederick W. Fleming.

Testimony in the *guilt phase* began on January 22, 1998. The jury began its deliberation the morning of February 6, 1998. That same day, the jury returned a verdict of "guilty" of premeditated murder in the first degree with the aggravating circumstances of rape, robbery and burglary, and felony murder in the first degree.

The *penalty phase* of the trial began on February 10, 1998.[6] On February 12, 1998, the jury, after deliberating for less than one day, returned a verdict recommending that leniency not be granted. The trial court on February 23, 1998 sentenced Petitioner to be punished by death.

## STANDARD OF REVIEW

Petitioner Davis raises 17 issues in this personal restraint petition. Issues 1-15 are based on claims of ineffective assistance of counsel. In issues 16 and 17 Petitioner raises two constitutional issues: that this State's death penalty scheme allows for cruel and unusual punishment and that our postconviction procedures for capital cases violate due process.

■■■ Petitioner brings this personal restraint petition challenging his aggravated first degree murder conviction and death sentence. This court has "exclusive original jurisdiction in personal restraint proceedings in which the

---

[6] RCW 10.95.050.

petitioner is under a sentence of death."[7] Under RAP 16.4(a), the court will "grant appropriate relief to a petitioner if the petitioner is under a 'restraint' as defined in [RAP 16.4(b)][8] and the petitioner's restraint is unlawful for one or more of the reasons defined in [RAP 16.4(c)]."[9]

In addition to the eligibility requirements for personal restraint petitions, as set forth in RAP 16.4,[10] this court has "limited the availability of collateral relief because it undermines the principles of finality of litigation, degrades the prominence of trial, and sometimes deprives society of the right to punish admitted offenders."[11]

As a general rule,[12] "collateral attack by [personal restraint petition] on a criminal conviction and sentence should not simply be a reiteration of issues finally resolved at trial and direct review, but rather should raise new points of fact and law that were not or could not have been raised in the principal action, to the prejudice of the

---

[7] RAP 16.3(c).

[8] RAP 16.4(b) states that:

A petitioner is under a "restraint" if the petitioner has limited freedom because of a court decision in a civil or criminal proceeding, the petitioner is confined, the petitioner is subject to imminent confinement, or the petitioner is under some other disability resulting from a judgment or sentence in a criminal case.

[9] RAP 16.4(c) states that:

The restraint must be unlawful for one or more of the following reasons:

. . . .

(6) The conditions or manner of the restraint of petitioner are in violation of the Constitution of the United States or the Constitution or laws of the State of Washington . . . .

[10] See also RCW 10.73.090, .100, .130, and .140.

[11] In re Pers. Restraint of St. Pierre, 118 Wn.2d 321, 329, 823 P.2d 492 (1992).

[12] A petitioner who has had no previous or alternative avenue for obtaining state judicial review need only satisfy the requirements under RAP 16.4. E.g., In re Pers. Restraint of Cashaw, 123 Wn.2d 138, 148-49, 866 P.2d 8 (1994) (a personal restraint petition (PRP) challenging a decision of the Indeterminate Sentence Review Board concerning parole need not meet the threshold requirements for constitutional and nonconstitutional errors because the policy of finality underlying those requirements is absent where the prisoner has had no previous or alternative avenue for obtaining state judicial review of the board decision); see also In re Pers. Restraint of Shepard, 127 Wn.2d 185, 191, 898 P.2d 828 (1995).

defendant."[13] The petitioner in a personal restraint petition is prohibited from renewing an issue that was raised and rejected on direct appeal[14] unless the interests of justice[15] require relitigation of that issue.[16]

A petitioner may, however, raise new issues on collateral attack, including errors of constitutional or nonconstitutional magnitude.[17] A "new" issue is not created merely by supporting a previous ground for relief with different factual allegations or with different legal arguments.[18] For example, "[a] defendant may not recast the same issue as an ineffective assistance claim; simply recasting an argument in that manner does not create a new ground for relief or constitute good cause for reconsidering the previous rejected claim."[19]

Two types of challenges, constitutional or nonconstitutional errors, may be raised in a collateral attack on a conviction or sentence.[20] To actually obtain relief on collateral review based on a constitutional error the petitioner must demonstrate by a preponderance of the evidence[21]

---

[13] *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388-89, 972 P.2d 1250 (1999).

[14] An issue is considered raised and rejected on direct appeal if the same ground presented in the petition was determined adversely to the petitioner on appeal and the prior determination was on the merits. *In re Pers. Restraint of Taylor*, 105 Wn.2d 683, 687, 717 P.2d 755 (1986).

[15] The interests of justice are served by reexamining an issue if there has been an intervening change in the law or some other justification for having failed to raise a crucial point or argument in the prior application. *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 720, 16 P.3d 1 (2001).

[16] *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994); *see also In re Gentry*, 137 Wn.2d at 388.

[17] Under RCW 10.73.140, in a subsequent personal restraint petition, petitioner must show good cause why the new grounds were not raised in the previous petition.

[18] *In re Pers. Restraint of Jeffries*, 114 Wn.2d 485, 488, 789 P.2d 731 (1990).

[19] *In re Stenson*, 142 Wn.2d at 720 (citing *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 906, 952 P.2d 116 (1998)).

[20] *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990).

[21] "[P]etitioner has the burden of establishing that, more likely than not, he was actually prejudiced by the claimed error." *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 89, 660 P.2d 263 (1983).

that petitioner was actually and substantially prejudiced by the error.[22] Under limited circumstances "[t]he petitioner's burden to establish actual and substantial prejudice may be waived where the error gives rise to a conclusive presumption of prejudice."[23] Although some errors that are per se prejudicial on direct appeal will also be per se prejudicial on collateral attack "the interests of finality of litigation demand that a higher standard be satisfied in a collateral proceeding."[24] The standard of review on a nonconstitutional issue is different. Nonconstitutional error requires more than a mere showing of prejudice. We will consider nonconstitutional error only when "the claimed error constitutes a fundamental defect which inherently results in a complete miscarriage of justice."[25]

■■ Under the sixth amendment to the United States Constitution and article I, section 22 of the Washington State Constitution, a defendant is guaranteed the right to effective assistance of counsel in criminal proceedings.[26] To successfully challenge the effective assistance of counsel, Petitioner must satisfy a two-part test. Petitioner must show that "(1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the

---

[22] *In re Cook*, 114 Wn.2d at 810; *In re Pers. Restraint of Crabtree*, 141 Wn.2d 577, 587, 9 P.3d 814 (2000).

[23] *In re St. Pierre*, 118 Wn.2d at 328 (rejecting proposition that constitutional errors which can never be considered harmless on direct appeal will also be presumed prejudicial for the purposes of personal restraint petitions).

[24] *In re St. Pierre*, 118 Wn.2d at 329.

[25] *In re Cook*, 114 Wn.2d at 813.

[26] *Strickland v. Washington*, 466 U.S. 668, 684-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Hendrickson*, 129 Wn.2d 61, 77, 917 P.2d 563 (1996); *see also In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001).

proceeding would have been different."[27] The United States Supreme Court has defined reasonable probability as "a probability sufficient to undermine confidence in the outcome."[28] A failure to establish either element of the test defeats the ineffective assistance of counsel claim.[29]

 This court approaches an ineffective assistance of counsel argument with a strong presumption that counsel's representation was effective.[30] Petitioner can "rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."[31] "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances."[32]

Although the requirement of an individualized inquiry into defense counsel's performance and resulting prejudice provides the general framework for analyzing an ineffective assistance of counsel claim, in certain limited cases prejudice will be presumed. In *United States v. Cronic*[33] retained defense counsel withdrew shortly before trial in a complex check kiting case. The court appointed a young lawyer with a real estate practice who had never participated in a jury trial to represent respondent, but allowed him only 25 days to prepare for trial, even though the government had taken over four and one-half years to investigate the case and had reviewed thousands of documents during that investigation. The Sixth Circuit Court of Appeals reversed making a

---

[27] *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987) (applying the two-prong test in *Strickland*, 466 U.S. at 687)).

[28] *Strickland*, 466 U.S. at 694.

[29] *Id.* at 700.

[30] *McFarland*, 127 Wn.2d at 335.

[31] *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) (citing *Strickland*, 466 U.S. at 688-89).

[32] *Id.*

[33] 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

finding of presumed incompetence. The Supreme Court reversed the Court of Appeals and explicated the very limited circumstances where a court may presume prejudice.[34]

■ This presumptive prejudice rule "is limited to the 'complete denial of counsel' and comparable circumstances, including: (1) where a defendant 'is denied counsel at a critical stage of his trial'; (2) where 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing'; (3) where the circumstances are such that 'the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial'[35]; and (4) where 'counsel labors under an actual conflict of interest.' "[36] Apart from circumstances of this nature and magnitude, the Supreme

---

[34] The dissent by Justice Sanders urges this court to adopt a per se rule for ineffective assistance of counsel on the issue of shackling despite our jurisprudence to the contrary on shackling. *State v. Clark*, 143 Wn.2d 731, 24 P. 3d 1006 (2001); *State v. Elmore*, 139 Wn.2d 250, 985 P.2d 289 (1999). The dissent also ignores the higher standard for collateral attack in PRP litigation.

[35] *Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932). The defendants had been indicted for a highly publicized capital offense. Six days before trial, the trial judge appointed " 'all the members of the bar' " for purposes of arraignment. "Whether they would represent the defendants thereafter if no counsel appeared in their behalf, was a matter of speculation only, or, as the judge indicated, of mere anticipation on the part of the court." 287 U.S. at 56. On the day of trial, a lawyer from Tennessee appeared on behalf of persons "interested" in the defendant, but stated that he had not had an opportunity to prepare the case or to familiarize in their behalf, was a matter of speculation only, or, as the judge indicated, of mere anticipation himself with local procedure, and therefore was unwilling to represent the defendants on such short notice. The problem was resolved when the court decided that the Tennessee lawyer would represent the defendants, with whatever help the local bar could provide. *Cronic*, 466 U.S. at 660-61. "The Court did not examine the actual performance of counsel at trial, but instead concluded that under these circumstances the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair. *Powell* was thus a case in which the surrounding circumstances made it so unlikely that any lawyer could provide effective assistance that ineffectiveness was properly presumed without inquiry into actual performance at trial." *Id.* (footnotes omitted).

[36] *Visciotti v. Woodford*, 288 F.3d 1097, 1106 (9th Cir.) (quoting *Cronic*, 466 U.S. at 659-61, 662 n.31), *rev'd on other grounds*, 537 U.S. 19, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002); *see also Bell v. Cone*, 535 U.S. 685, 694-96, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Smith v. Robbins*, 528 U.S. 259, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).

Court has said "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt."[37]

## DISCUSSION

Petitioner maintains he suffered a Sixth Amendment violation for which prejudice should be presumed under *Cronic* because his attorneys entirely failed to present a defense during the *guilt phase* of his trial.

 However, the record does not support his contention. Defense counsel hired investigators, conducted numerous pretrial investigations, hired expert witnesses, moved to suppress evidence, raised objections to evidence, cross-examined the prosecution's witnesses, presented closing argument to the jury, moved for a mistrial, and introduced evidence of mitigating circumstances during the *penalty phase*. Absent a complete denial of counsel or a breakdown in the adversarial process, Davis "can therefore make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel."[38] We cannot conclude that defense counsel *entirely failed* "to subject the prosecution's case to meaningful adversarial testing."[39] None of the exceptions listed in *Cronic* apply to this case. In order to prevail on his claim of ineffective assistance of counsel, Petitioner must satisfy the performance and prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This he has not done. We examine his specific claims of ineffective assistance of counsel in issues 1-15 below, followed by his constitutional arguments in issues 16 and 17.

### FAILURE TO OBJECT TO SHACKLING OF PETITIONER

*ISSUE (1). Whether Petitioner's right to counsel under the sixth and fourteenth amendments to the United States*

---

[37] *Cronic*, 466 U.S. at 659 n.26.

[38] *Id.* at 666.

[39] *Id.* at 659-61.

*Constitution was violated when his counsel did not object to Petitioner being shackled during the guilt phase and penalty phase of his trial and when his counsel did not take adequate precautions to ensure that the jury could not observe Petitioner in restraints.*

Petitioner argues ineffective assistance of counsel in the *guilt phase* and *sentencing phase*. Petitioner claims that his counsel did not object to his being shackled during trial and then did not take adequate precautions to ensure that the jury could not see the shackles.

This case was initially assigned for trial before the Honorable Terry D. Sebring. Pretrial motions were heard by Judge Sebring beginning on June 24, 1997, and the trial began on November 3, 1997. On the first day of voir dire examination of the jury, Petitioner appeared in court restrained by ankle shackles. Defense counsel objected, arguing that the restraints were unnecessary because Petitioner had no history of being uncooperative in the courtroom and while in custody. Counsel argued that the sight of Petitioner in restraints would prejudice the jury.

In response, the State argued that the jail staff, as part of established procedure, had begun to restrain all defendants facing severe charges. The prosecutor urged the court to think in terms of "potential trouble, as opposed to either actual events in a particular case." The State proposed that the trial judge offer a curative instruction to the jury concerning Petitioner's shackling.

Judge Sebring heard testimony from a jail supervisor, Sergeant Gerrish. He testified that because of a recent attempted escape and resulting injury to an officer, the jail staff adopted the policy that all defendants facing serious allegations would be leg-ironed while being moved. The attempted escape about which Sergeant Gerrish spoke occurred the previous week in Judge Sebring's courtroom.

Judge Sebring indicated he was inclined to order Petitioner shackled during trial and, as a remedial measure,

suggested that counsel place boxes or briefcases under Petitioner's table to block the jury's view of the ankle chains. Defense counsel rejected the State's proposal for an instruction, arguing that it would simply emphasize the prejudicial circumstances created by the shackles. Counsel insisted that merely obscuring the jury's view of Petitioner's shackled ankles would not be effective because the shackles would rattle and be noticed by the jury each time Petitioner rose from his chair. Judge Sebring overruled defense counsel's objection and ordered Petitioner shackled.

On November 24, 1997, Judge Sebring became ill and recused himself from the trial. In a letter addressed to all parties, Judge Sebring transferred the case "back to Court Administration" so it could be reassigned to another judge. In his letter, Judge Sebring stated that his prior orders and rulings would "remain in effect, unless or until modified by the new trial judge." Defense counsel objected to Judge Sebring's replacement by another judge, and on November 12, 1997, the Honorable Frederick B. Hayes granted a mistrial under CrR 6.11(a).

Following the mistrial, a new trial began with jury selection on January 5, 1998 before the Honorable Frederick W. Fleming. On February 6, 1998, the jury returned a verdict of "guilty" of premeditated murder in the first degree with the aggravating circumstances of rape, robbery, and burglary, and felony murder in the first degree. The penalty phase of the trial began on February 10, 1998. On February 12, 1998, within hours of beginning its deliberations, the jury returned a verdict finding there were not sufficient mitigating circumstances to merit leniency. The trial court on February 23, 1998 sentenced Petitioner to be punished by death.

There is no record of defense counsel objecting to the shackling of Petitioner during the second trial.

(a) Reference Hearing

Because the record was unclear as to the extent to which the jury could detect that the defendant was physically

restrained, this court remanded for a hearing on the following questions:

> (1) What type of restraint devices were used to restrain petitioner, Cecil Davis, during the guilt and penalty phases of Davis's trial?
>
> (2) What precautions, if any, were taken during the entire trial to prevent jurors from gaining knowledge that Davis was in restraints as he entered or was in the courtroom?
>
> (3) What jurors, if any, personally observed that Davis was fitted with restraint devices during the course of the guilt and/or penalty phases of the trial?
>
> (4) If any juror observed Davis in restraints, what was the extent of the juror's observations?
>
> (5) What jurors, if any, learned from other jurors that Davis was restrained? Indicate what each juror was told.[40]

The trial court held a reference hearing, which took place over the course of two weeks and concluded on September 16, 2003. At the reference hearing Davis presented testimony from a number of witnesses, including 5 of the 15 jurors, regarding the nature and visibility of his shackles.[41] Following the conclusion of testimony the trial court entered extensive findings of fact, ultimately finding that Davis wore leg restraints during both the guilt and penalty phases of his trial, that numerous precautions were taken to ensure no juror could see the leg restraints, and that no

---

[40] Wash. State Supreme Court Order, *In re Pers. Restraint of Davis* (May 23, 2003).

[41] The five jurors who testified at the hearing were: (1) Denise Nikkula-Binnie; (2) Daniel Sheppard; (3) Ed Nelson; (4) Karen Dasher; and (5) Michael Buchanan. In addition to the five jurors, the following witnesses also testified at the reference hearing: (1) Lloyde Alton, Davis's lead trial counsel; (2) Christina Baldwin, Davis's brother's fiancée; (3) Penny Cole, a private investigator hired by Davis's appellate counsel; (4) Christopher Cooley, a corrections officer for the Pierce County Sheriff's Office who occasionally helped escort Davis to and from the courtroom during his trial; (5) Gerald Costello, one of the deputy district attorneys who prosecuted Davis's case; (6) Davis; (7) Julia Lindstrom, Alton's cocounsel representing Davis during his trial; (8) Keith MacFie, the attorney who represented Wilson, Davis's codefendant; (9) Louanne Martin, the trial judge's judicial assistant at the time of Davis's trial; (10) John Neeb, one of the deputy district attorneys who prosecuted Davis's case; (11) Kenneth Swanson, a private investigator hired by the Pierce County Prosecutor's Office; and (12) Wilson, Davis's codefendant.

juror saw or learned anything about the restraints during either the guilt or penalty phases of Davis's trial.

■ Factual findings are erroneous where not supported by substantial evidence in the record.[42] Substantial evidence exists where there is a "sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding."[43]

Davis makes a plethora of objections regarding both the outcome and procedure of the reference hearing. First, he claims many of the trial court's findings of fact are incorrect and not supported by substantial evidence. Second, Davis argues the trial court erred by permitting jurors to testify that the shackling did not affect their verdict. Third, he contends the trial court erred by refusing to adopt his supplemental findings of fact. Fourth, the trial court, according to Davis, erred by refusing to permit him to present evidence that some of the jurors were allegedly biased against him. Finally, Davis argues the trial court denied him a full and fair reference hearing.

According to Davis, several of the trial court's findings of fact are clearly erroneous and should be disregarded by this court. According to the State, the challenged findings of fact are accurate and supported by substantial evidence.

■ A personal restraint petitioner bears the burden of proving issues in a reference hearing by a preponderance of the evidence.[44] Where a trial court makes factual findings, those that go unchallenged are verities on appeal.[45] Our review of challenged factual findings is limited to determining whether the findings are supported by substantial evidence.[46] "Substantial evidence exists when the record contains evidence of sufficient quantity to persuade a

---

[42] *State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994).

[43] *Id.* at 644 (citing *State v. Halstien*, 122 Wn.2d 109, 129, 857 P.2d 270 (1993)).

[44] *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 410, 972 P.2d 1250 (1999).

[45] *Hill*, 123 Wn.2d at 647.

[46] *Gentry*, 137 Wn.2d at 410; *see also State v. Vickers*, 148 Wn.2d 91, 116, 59 P.3d 58 (2002).

fair-minded, rational person that the declared premise is true."[47] The party challenging a factual finding bears the burden of proving that it is not supported by substantial evidence in the record.[48] A trial court's credibility determinations cannot be reviewed on appeal, even to the extent there may be other reasonable interpretations of the evidence.[49]

A trial court is not required to make findings of fact regarding every item of evidence introduced in the case, but it must make findings as to all ultimate facts and material issues.[50]

"A material fact is one upon which the outcome of the litigation depends."[51] An ultimate fact is one that is essential and determinative, without which a judgment would lack support in an essential particular.[52]

*i. Barrier In Front of Defense Counsel Table Routinely Checked and Maintained*

The trial court found the defense and prosecuting attorneys at Davis's trial erected a barrier of boxes, briefcases, and garbage cans in front of defense counsel table in an effort to prevent the jury from seeing Davis's leg restraints. Davis assigns error to the trial court's findings that "[t]his barrier was routinely maintained throughout the guilt and penalty phases,"[53] and "the attorneys periodically and regularly checked it each day, morning and afternoon, to

---

[47] *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 112, 937 P.2d 154, 943 P.2d 1358 (1997), *quoted in Gentry*, 137 Wn.2d at 410.

[48] *Nordstrom Credit, Inc. v. Dep't of Revenue*, 120 Wn.2d 935, 939-40, 845 P.2d 1331 (1993).

[49] *Gentry*, 137 Wn.2d at 410-11.

[50] *Le Maine v. Seals*, 47 Wn.2d 259, 263-64, 287 P.2d 305 (1955); *Wold v. Wold*, 7 Wn. App. 872, 875, 503 P.2d 118 (1972); *see also Williamson v. United Bd. of Carpenters & Joiners*, 12 Wn.2d 171, 186-87, 120 P.2d 833 (1942).

[51] *Clements v. Travelers Indem. Co.*, 121 Wn.2d 243, 249, 850 P.2d 1298 (1993).

[52] *Wold*, 7 Wn. App. at 875.

[53] Clerk's Papers (CP) at 252.

ensure that it was intact."[54] Davis's lead trial counsel, Lloyde Alton, testified that after he and the other attorneys at Davis's trial initially erected the barrier, "on subsequent days or mornings and afternoons, we would adjust the boxes and so on to try and hide the shackles."[55] Alton also testified that prior to each court session "we would take notice of whether anything had been moved or there was a big gap or anything."[56] Deputy Prosecutor John Neeb corroborated Alton's testimony stating that any time one of the defense attorneys removed a briefcase from the barrier, the attorney would put it back in place before the next court session.[57] None of the witnesses, however, testified that they checked the barrier every "morning and afternoon," as the trial court concluded. Therefore, the record provides substantial evidence to support the trial court's finding that the barrier was routinely maintained, although the record does not support the finding that the attorneys checked the barrier each morning and afternoon.

### ii. Attorneys Exercised Best Efforts to Ensure Jury Did Not See Restraints

Next, Davis takes exception to the trial court's finding that "[t]he attorneys exercised their best efforts to ensure that [Davis's] leg restraints were not seen by any jurors."[58] The sole basis for Davis's argument is that the attorneys chose to erect a barrier of moveable objects in front of the defense counsel table instead of creating a permanent fixed barrier. But, Davis fails to cite any authority indicating the distinction between a permanent fixed barrier and one made of moveable objects is relevant to whether an attorney exercised his or her best efforts to conceal a defendant's restraints from the jury. The impor-

---

[54] CP at 253.

[55] Verbatim Report of Proceedings (VRP) at 320.

[56] VRP at 322.

[57] VRP at 295.

[58] CP at 254.

tant fact is that the attorneys erected a barrier, which they routinely maintained, in an effort to prevent the jurors from seeing Davis's shackles. As such, Davis has not established the trial court's finding is not supported by substantial evidence.

### iii. Davis Dressed to Conceal Restraints

Davis assigns error to the trial court's conclusion that he "was dressed so as to conceal the appearance of the leg restraints."[59] Davis argues the trial court's finding is not supported by substantial evidence because one of his trial attorneys, Julia Lindstrom, who purchased his pants for trial, never testified that she checked to see if Davis's pants covered his restraints. But, contrary to Davis's contention, Lindstrom testified that she and Alton "tried to make sure" his pants covered the shackles.[60] Accordingly, the trial court's finding is supported by substantial evidence.

### iv. Jurors Who Testified Were Credible and Truthful

Davis maintains the trial court erred by finding "[a]ll of the jurors who testified at the reference hearing were credible and truthful."[61] The sole basis for Davis's challenge is juror Dasher's testimony at the reference hearing wherein she explained away the previous declaration she provided Davis stating she had seen him in restraints. According to Davis "Dasher either perjured herself when she signed the first declaration or she was so casual about the oath that there is no reason to believe her at the hearing."[62] However, there is nothing in Dasher's testimony at the reference hearing itself to give rise to a substantial reason to question her credibility and truthfulness. Furthermore, a trial court's determination of a wit-

---

[59] CP at 254.

[60] VRP at 272.

[61] CP at 255.

[62] Pet'r's Am. Suppl. Br. Regarding Shackling at 62.

ness's credibility cannot be disturbed on appeal.[63] Thus, the trial court did not err by finding the jurors who testified at the reference hearing were credible and truthful.

### v. No Juror Saw Davis Wearing Restraints During Trial

Davis maintains the trial court erred by finding "[n]o juror saw [Davis] in restraints at any time during the guilt or penalty phases."[64] Davis assigns error to the trial court's more specific findings that jurors Buchanan, Nelson, and Dasher did not see Davis in leg restraints at all during the course of the proceedings.

#### • Juror Buchanan

Davis argues the trial court erred by finding "[j]uror Michael Buchanan did not see [Davis] in leg restraints."[65] After testifying on direct examination at the reference hearing that he had been contacted after Davis's trial by the State's investigator, Kenneth Swanson, the following colloquy between Buchanan and Davis's counsel took place:

Q: Did you tell Mr. Swanson that you saw shackles, saw Mr. Davis in shackles?

A: Yes, sir, if you could call them shackles. Again, I noticed a shiny device around his ankles. I don't know what a shackle looks like.

Q: Did you conclude after you saw the shiny device that the shiny device was leg shackles?

A: Yes, sir.

Q: How many times did you see that?

A: I don't remember.

Q: Did you tell Mr. Swanson that you saw them twice?

A: I believe.

Q: Is that what your declaration says?

---

[63] *Gentry*, 137 Wn.2d at 410-11.

[64] CP at 255.

[65] CP at 255.

A: Again, we are talking about five years ago, six years ago. I believe that I did see it twice.[66]

Buchanan later clarified that it was during the *guilt* phase of Davis's trial that he noticed the shiny device around Davis's ankles that he concluded were leg shackles.[67] Furthermore, Buchanan maintained his position under cross-examination by the State: "Q: Is it your testimony that on two occasions you saw something shiny on Mr. Davis' boots that you believed to be restraints? A: I believe that's a fair statement. Q: Okay. And this was during the trial, not the penalty phase? A: Right."[68]

 Buchanan's own testimony makes clear he saw Davis wearing leg restraints on two occasions during the guilt phase of Davis's trial. Accordingly, the trial court's finding that Buchanan did not see Davis in leg restraints is clearly erroneous and thus we disregard the trial court's finding on this point.

• Juror Nelson

Davis challenges the trial court's finding that "[j]uror Ed Nelson did not see [Davis] in leg restraints."[69] Nelson testified that the only time while he and other potential jurors were waiting in a courthouse hallway prior to voir dire, he saw both Davis and Wilson being escorted into the courtroom in "standard restraints" around their "wrists and ankles,"[70] during a transfer from "an elevator through a hallway into a larger courtoom."[71] Nelson testified that he never saw Davis wearing restraints inside the courtroom.[72] Although Nelson stated he suffered a head injury after

---

[66] VRP at 154-55.

[67] VRP at 160, 168.

[68] VRP at 173.

[69] Pet'r's Am. Suppl. Br. at 66; CP at 256.

[70] VRP at 597-98.

[71] VRP at 604.

[72] VRP at 598, 603.

Davis's trial, he specifically testified that his memory of what he saw outside the courtroom was not affected by the injury.[73]

The Petitioner concedes that the trial court's finding that no juror saw Davis being transported from the freight elevator was accurate.[74] That was the only time that Nelson ever recalled seeing Davis in shackles.[75] The trial court concluded that Nelson did not see Davis in handcuffs on the day the case was called for trial. Juror Nelson described seeing someone wearing an orange uniform with handcuffs in the front. However, Davis never wore an orange uniform in the presence of the jury. Davis testified that his cuffs were always handcuffed behind his back. Thus, the trial court's finding that juror Nelson did not see Davis in leg restraints is supported by substantial evidence.[76]

- Juror Dasher

Davis assigns error to the trial court's findings that: (1) "Dasher did not observe [Davis] in leg restraints,"[77]; (2) "Dasher's prior inconsistent statements derive in large part

---

[73] VRP at 600-01.

[74] Pet'r's Reply Br. at 8.

[75] VRP at 604.

[76] Based on Nelson's testimony, Davis initially assigned error to the trial court's finding that there was "no evidence that any juror saw [Davis] as he was transported between the freight elevator and the courtroom." CP at 253-54. The basis for Davis's claim was that Nelson had seen Davis in shackles as he was being brought into the courtroom through the hallway. The State noted in its supplemental brief that voir dire occurred in a first floor courtroom at the Pierce County Courthouse, whereas the trial took place in a fifth floor courtroom. According to the State the freight elevator was used to transport Davis to the fifth floor courtroom but not to the courtroom on the first floor where voir dire occurred. As such the State argued that Nelson's testimony that he saw Davis in shackles in the courthouse hallway prior to voir dire did not undermine the trial court's conclusion that no juror saw Davis shackled as he was transported from the freight elevator to the courtroom where his trial took place. In his reply brief, Davis agreed with the State that the trial court's finding that no juror saw Davis being transported from the freight elevator was accurate as to the fifth floor courtroom where Davis's trial took place.

[77] CP at 256.

from her first contact with [Davis's] private investigator,"[78]; and (3) "Dasher learned nothing about restraints from any other juror."[79]

At the reference hearing Dasher testified that she did not recall seeing Davis in restraints.[80] Dasher did, however, acknowledge that she had previously signed a declaration prepared by defense investigator Penny Cole stating she had seen Davis in "leg shackles" at his trial.[81] According to Dasher, Cole brought her the declaration to sign at the school where she worked during a very busy time of the day. Dasher made clear that contrary to her declaration she did not see Davis in shackles, and that her reason for saying she did "could have been the power of suggestion."[82] Dasher's claim that Cole could have suggested Davis was shackled during his trial is corroborated by Cole's admission that she asked Dasher suggestive questions.[83]

Although Dasher testified that she never saw Davis in leg restraints, she did recall hearing another juror mention restraints on one occasion during Davis's trial.[84] On direct examination Dasher testified:

[78] CP at 256.

[79] CP at 257.

[80] VRP at 359, 387-88.

[81] VRP at 365-66.

[82] VRP at 363.

[83] Cole testified that when she contacted the jurors after Davis's trial to ask them questions regarding shackling, she followed a specific script of prepared questions. VRP at 536-40. The script, which the trial court admitted into evidence, included the following questions regarding shackling:

2. What impression did seeing the restraints on the defendants give you?

3. Did seeing the restraints give you the impression that the defendant was a dangerous person [?] Which defendant [?] Did you feel personally in danger?

4. After seeing the defendant in restraints in the courtroom would you have felt in danger if the restraints had been removed?

5. Were you aware of just leg restraints, or of hand and leg restraint [sic] when the defendant was in the courtroom?

6. See restraints well enough to see if it [sic] woven cloth; plastic; metal?

CP at 171-72.

[84] VRP at 359, 379.

Q: While you were a juror, did you hear any comments by other jurors concerning restraints?

A: As I said earlier, I did hear a comment in the jury room. I don't know if it was one of the male or females at this point. I heard somebody say, did he have special buckles on his shoes, or was that something—or was that a restraint. That is as far as any of the conversation got, and there was no—it was such a blip on the screen, it was not any great big deal at all.[85]

Dasher later acknowledged that she briefly mentioned her previous experience with restraints in her dealings with behaviorally disabled children to that juror.[86] According to Dasher this conversation took place in the jury room with other jurors around.[87]

Dasher's testimony provides substantial evidence to support the trial court's finding that she did not see Davis in leg restraints. The trial court's finding that Dasher's prior inconsistent statements derived in large part from her first contact with Cole is also supported by substantial evidence in the record. On the other hand, the trial court's finding that Dasher learned nothing about restraints from any other juror is clearly erroneous. By Dasher's own testimony she had a short conversation with another juror in the jury room during Davis's trial about restraints.[88]

We hold that the trial court erred in finding that juror Buchanan did not see Davis in shackles. Juror Buchanan

---

[85] VRP at 359.

[86] VRP at 379. Although Dasher could not identify with certainty the juror who made the comment about shackles, when pressed by the State on cross-examination she tentatively identified the juror as "the older lady," named "Lillian, or Lilah or something." VRP at 389.

[87] VRP at 379.

[88] To this extent, Davis claims the trial court erred by finding "Dasher made no comment when she heard the other juror mention restraints," Pet'r's Am. Suppl. Br. Regarding Shackling at 71, because "Dasher responded to that comment by mentioning her own experience with disabled children," id. at 73. But the trial court actually found "Dasher never spoke to any *other* juror on this topic or the comment she overheard and no juror spoke to her about her comment or overhearing the comment that was made by the other jurors." CP at 258 (emphasis added). As such the trial court's finding in this regard is consistent with Davis's version of the facts and there is no error that needs to be addressed here.

saw Davis in shackles on two occasions during the guilt phase for very brief glimpses. We hold that the trial court's findings of fact on what juror Nelson and juror Dasher saw are supported by substantial evidence.

*vi. Testimony Regarding Effect of Shackling on Verdict*

Davis contends the trial court erred by permitting, over his objection, jurors Buchanan, Dasher, and Nelson to testify at the reference hearing that their knowledge of Davis's shackling did not influence or affect their verdict. At the reference hearing the trial court permitted Buchanan to testify that seeing Davis in restraints on two occasions during the guilt phase of the trial had no effect on his verdict in the guilt or penalty phases.[89] The trial court also permitted Dasher to testify that another juror's comment to her that one of the defendants was wearing restraints "did not make or have any bearing on whether I thought Mr. Davis was guilty or not."[90] And finally the trial court permitted Nelson to testify that seeing Davis in restraints in the hallway prior to voir dire did not have any effect on his deliberations or verdict.[91]

According to Davis, the jurors' testimony about whether they subjectively believed that knowledge of his shackling affected their deliberations was outside the scope of the five questions we asked the trial court to resolve at the reference hearing and is irrelevant under case law. The State counters that to prevail on his claim of shackling, Davis has to show he was actually prejudiced such that the jury's verdict was affected by his shackling. As a result, according to the State, the trial court did not err by allowing jurors to testify that Davis's shackling did not affect their decisions.

██ Davis cites to the Ninth Circuit's decision in *Dyas* for the proposition that jurors' subjective beliefs regarding the effect of shackling is irrelevant and must be disre-

---

[89] VRP at 173.

[90] VRP at 360.

[91] VRP at 613.

garded.[92] However in *Dyas*, no precautions were taken to conceal the shackles from the jurors; the evidence of guilt was not overwhelming; and the jurors' subjective views on shackling were given before trial took place.[93] *Dyas* is distinguishable from the present case, where the jurors' testimony on the effect of shackling on them was given after trial concluded. Because on collateral relief the inquiry is (1) whether the petitioner was actually prejudiced, and (2) whether the prejudice was substantial, consideration of actual effect might be probative. However, given the remoteness in time of the reference hearing from the actual verdict, we decline to consider such testimony.

### vii. Supplemental Findings of Fact

Davis argues the trial court erred by failing to adopt seven of his proposed findings of fact. These include findings that: jurors seated in the jury box close to the jury room doorway would have had an unobstructed view to the area underneath defense counsel table if the barrier erected by the attorneys did not block their view; jurors Dasher and Buchanan sat in the upper row of the jury box next to the jury room doorway; the barrier in front of the defense counsel table was made of moveable objects; none of the attorneys specifically remembered checking every day or more than once during a single day to make sure the barrier in front of the defense counsel table was in place; juror Buchanan saw buckles or rings around Davis's ankles he believed were restraints, and he believed Davis must have done something that caused him to be in restraints; a juror made a comment to Dasher about seeing restraints on one of the defendants and juror Dasher responded by mentioning her own experience with disabled children; and Dasher indicated people are placed in restraints because they are a danger to themselves or others. Several of Davis's proposed findings were covered by the trial court's findings, albeit

---

[92] *Dyas v. Poole*, 317 F.3d 934, 937 (9th Cir. 2003).

[93] *Id.* The dissent by Justice Sanders fails to consider these distinctions in its reliance on *Dyas*.

contrary to Davis's version of the facts, and were discussed above.

The only proposed findings that were not addressed, one way or another, in the trial court's findings, are those pertaining to the view from and seating arrangement in the jury box. Davis claims the trial court should have adopted these proposed findings because the vantage point in the jury box from which his shackles could have been visible, but for the barrier obstructing the view, is material to whether Dasher and Buchanan actually saw Davis wearing shackles in the courtroom. However, had the court adopted Davis's proposed findings of fact, that would not change the outcome of the issue they support: whether any juror *actually* saw Davis in shackles in the courtroom during the guilt or penalty phases of his trial. Whether Buchanan and Dasher might have been able to see under the defense counsel table absent the barrier is immaterial to whether they actually saw Davis wearing restraints in the courtroom. Buchanan testified he did, Dasher testified she did not.

### viii. Evidence of Potential Bias

██ ██ Davis claims the trial court erred by not allowing him to question several jurors and the State's investigator, Swanson, about possible bias or prejudice some jurors allegedly harbored against him.[94] As authority for his argument, Davis cites cases supporting a criminal defendant's Sixth Amendment right to cross-examine adverse witnesses to reveal possible bias or prejudice.[95] Davis contends he "had a constitutional right to cross-examine these witnesses to establish bias or prejudice."[96] But, a

---

[94] Davis sought to establish that jurors Nikkula-Binnie, Buchanan, Dasher, and Sheppard were biased against him, allegedly because they were upset about the possibility he might get his conviction and sentence reversed on appeal.

[95] *See Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *State v. Kilgore*, 107 Wn. App. 160, 26 P.3d 308 (2001).

[96] Pet'r's Reply Br. Regarding Shackling at 12.

personal restraint petition is a civil proceeding,[97] and none of the authority Davis cites supports his claim that he had a Sixth Amendment right to question witnesses at the reference hearing on the issue of bias. Furthermore, Davis has not established the witnesses were adverse. The trial court's refusal to permit questioning regarding bias was on direct examination of each of the witnesses.

Davis' contention that the trial court committed nonconstitutional error by refusing to allow him to present evidence on the issue of bias must also fail. The rules of evidence apply at a reference hearing.[98] The trial court has the obligation to control the mode and order of questioning witnesses.[99] This court reviews the trial court's evidentiary rulings for abuse of discretion.[100] A trial court abuses its discretion when its " 'decision is manifestly unreasonable, or is exercised on untenable grounds or for untenable reasons.' "[101] The only nonconstitutional reason Davis provides supporting his claim that the trial court erred by refusing to permit him to question witnesses about potential bias is that such questions were relevant to show their reluctance to admit seeing him in shackles. Davis provides no grounds to prove the trial court's decision was manifestly unreasonable or based on untenable grounds or reasons. Without such authority, Davis has not established the trial court abused its discretion.

### ix. Full and Fair Hearing

Davis asserts the trial court denied him a full and fair reference hearing because it had an "actual bias" against him. To support his claim Davis argues the trial court: (1) "consistently ruled in favor of the State on evidentiary

---

[97] *In re Pers. Restraint of Lord*, 123 Wn.2d 737, 739 n.2, 870 P.2d 964 (1994).

[98] RAP 16.12.

[99] ER 611(a).

[100] *State v. Stenson*, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997).

[101] *State v. Michielli*, 132 Wn.2d 229, 240, 937 P.2d 587 (1997) (quoting *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993)).

issues;" (2) "ruled that the State could ask the jurors whether seeing [Davis] in shackles influenced their verdict but it would not permit [Davis] to question jurors about possible bias;" (3) entered findings directly contrary to the record; and (4) "refused to enter any of [Davis's] proposed supplemental findings."[102] The State counters that Davis's claim is frivolous because there is no evidence the trial judge had any monetary, professional, or personal interest in the outcome and had no personal relationship with any of the witnesses or attorneys involved in the case.

It is unquestionably true, as Davis points out, that trial before an unbiased judge is an essential element of due process.[103] At a minimum, due process "requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case."[104] There is a presumption that a trial judge properly discharged his/her official duties without bias or prejudice.[105] The party seeking to overcome that presumption must provide specific facts establishing bias.[106] Judicial rulings alone almost never constitute a valid showing of bias.[107]

Davis has not provided specific facts establishing that the trial judge had a personal bias against him. Instead Davis points to the record as "reflective of actual bias,"[108] but there is no evidence in the record that the trial judge had a personal interest in the outcome of the reference hearing or

---

[102] Pet'r's Am. Suppl. Br. Regarding Shackling at 75.

[103] *Johnson v. Mississippi*, 403 U.S. 212, 216, 91 S. Ct. 1778, 29 L. Ed. 2d 423 (1971); *Bloom v. Illinois*, 391 U.S. 194, 205, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968).

[104] *Bracy v. Gramley*, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975)).

[105] *Kay Corp. v. Anderson*, 72 Wn.2d 879, 885, 436 P.2d 459 (1967); *Jones v. Halvorson-Berg*, 69 Wn. App. 117, 127, 847 P.2d 945 (1993).

[106] *See State v. Post*, 118 Wn.2d 596, 619 n.9, 826 P.2d 172, 837 P.2d 599 (1992).

[107] *See Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994).

[108] Pet'r's Am. Suppl. Br. Regarding Shackling at 78.

was otherwise personally prejudiced against him. Consequently, Davis has failed to establish the trial court was biased against him thereby denying him a full and fair reference hearing.

We adopt the trial court's reference hearing findings with the exception that only one juror caught brief glimpses of shiny things on Petitioner's shoes which he took to be shackles on two separate occasions during the *guilt* phase. The reference hearing also clarifies (1) that the barrier in front of the defense counsel table was routinely checked and maintained, (2) that attorneys exercised their best efforts to ensure that Petitioner's leg restraints were not seen by any jurors, and (3) that Petitioner was dressed to conceal the appearance of the leg restraints.

(a) Shackling jurisprudence

 Consistent with due process requirements, a defendant may be shackled[109] during trial only as a last resort. It is a "long-standing rule in this jurisdiction[110] . . . that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances."[111] This rule exists to assure the guaranty under the sixth and fourteenth amendments

[109] A "shackle" is defined as "something that confines the legs or arms so as to prevent their free motion; . . . a ring or band enclosing ankle or wrist and fastened to something else (as its mate) by a chain or a strap : MANACLE, FETTER . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2297 (1993).

[110] This court in 1897 observed that keeping a defendant in restraints during trial might be a violation of the defendant's constitutional rights because " 'the jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers.' " *State v. Williams*, 18 Wash. 47, 51, 50 P. 580 (1897) (quoting *State v. Kring*, 64 Mo. 591, 593 (1877)). In addition, keeping the defendant in restraints during trial may deprive him of the full use of all his faculties. *Williams*, 18 Wash. at 51.

[111] *State v. Clark*, 143 Wn.2d 731, 772, 24 P.3d 1006 (2001); *see also Holbrook v. Flynn*, 475 U.S. 560, 568, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986); *Estelle v. Williams*, 425 U.S. 501, 505, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976); *Illinois v. Allen*, 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970); *State v. Rodriguez*, 146 Wn.2d 260, 263-64, 45 P.3d 541 (2002); *State v. Damon*, 144 Wn.2d 686, 690, 25 P.3d 418 (2001); *State v. Turner*, 143 Wn.2d 715, 725, 23 P.3d 499 (2001); *State v. Elmore*, 139 Wn.2d 250, 273, 985 P.2d 289 (1999); *State v. Finch*, 137 Wn.2d 792, 842, 975 P.2d 967 (1999); *State v. Hutchinson*, 135 Wn.2d 863, 887, 959 P.2d 1061 (1998); *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981);

to the United States Constitution that the defendant receives a fair and impartial trial by protecting certain constitutionally recognized rights, including the right to be presumed innocent, the right to testify on one's own behalf, and the right to assist and confer with counsel during trial.[112]

Although physically restraining a defendant with shackles or handcuffs during trial is a potentially prejudicial practice, employing such a technique is not of itself unconstitutional.[113] A substantive claim of unconstitutional shackling in this State is subject to harmless error analysis.[114] Under that analysis, the defendant must show that the shackling "had substantial or injurious effect or influence on the jury's verdict."[115] We have found unconstitutional shackling harmless in cases where there is overwhelming evidence of the defendant's guilt. In *State v. Clark*, we stated:

> The test for harmless error is whether the state has overcome the presumption of prejudice when a constitutional right of the defendant is violated when, from an examination of the record, it appears the error was harmless beyond a reasonable doubt, or whether the evidence against the defendant is so overwhelming that no rational conclusion other than guilt can be reached.[116]

Because visible shackling or handcuffing a defendant during trial is likely to prejudice a defendant,[117] the practice

---

*State v. Ollison*, 68 Wn.2d 65, 69, 411 P.2d 419 (1966); *State v. Sawyer*, 60 Wn.2d 83, 86, 371 P.2d 932 (1962); *Williams*, 18 Wash. at 51.

[112] *Hartzog*, 96 Wn.2d at 398.

[113] *Allen*, 397 U.S. at 344.

[114] *Clark*, 143 Wn.2d at 775; *see also Rhoden v. Rowland*, 10 F.3d 1457, 1459 (9th Cir. 1993).

[115] *Hutchinson*, 135 Wn.2d at 888 (citing *Rhoden*, 10 F.3d at 1459-60).

[116] *Clark*, 143 Wn.2d at 775-76 (citations omitted); *see also Ghent v. Woodford*, 279 F.3d 1121, 1132 (9th Cir. 2002) (in order for the unjustified shackling to rise to the level of a constitutional error, the defendant must make a showing that he suffered prejudice as a result).

[117] *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999).

"should be permitted only where justified by an essential state interest specific to each trial."[118] Only factors that indicate a manifest need for some measure to maintain the security of the courtroom should be considered. "The trial court must base its decision to physically restrain a defendant on evidence which indicates that the defendant poses an imminent risk of escape, that the defendant intends to injure someone in the courtroom, or that the defendant cannot behave in an orderly manner while in the courtroom. To do otherwise is an abuse of the trial court's discretion."[119]

The United States Court of Appeals for the Ninth Circuit has concluded that in order to satisfy due process requirements while shackling a defendant during trial, the court must engage in an analysis of the security risks posed by the defendant as well as consider less restrictive alternatives before permitting a defendant to be restrained.[120]

■ The test is " 'whether what [the jurors] saw was so inherently prejudicial as to pose an unacceptable threat to defendant's rights to a fair trial.' "[121] The United States Supreme Court has stated that "[w]henever a courtroom arrangement is challenged as inherently prejudicial, . . . the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.' "[122]

The unjustified shackling of a defendant in front of a jury for a prolonged period can have a prejudicial impact on the rights of the defendant. In *State v. Finch*, 137 Wn.2d 792,

[118] *Holbrook*, 475 U.S. at 568-69.

[119] *Finch*, 137 Wn.2d at 850.

[120] *Stewart v. Corbin*, 850 F.2d 492 (9th Cir. 1988).

[121] *Rhoden*, 10 F.3d at 1460 (alteration in original) (quoting *Holbrook*, 475 U.S. at 572 which held that prisoner was not denied his constitutional right to a fair trial when, at his trial with five codefendants, customary courtroom security force was supplemented by four uniformed state troopers sitting in first row of spectator section).

[122] *Holbrook*, 475 U.S. at 570 (quoting *Williams*, 425 U.S. at 505).

975 P.2d 967 (1999), we held that shackling a defendant during the *penalty phase* of a capital murder case may have an effect on the jury's determination of future dangerousness and reversed the defendant's death sentence. But we concluded the evidence of guilt was so overwhelming that the shackling error during the *guilt phase* of the trial was harmless. We found that although future dangerousness had not been specifically argued, the fact that the defendant had not only been shackled but also had been handcuffed to his chair and leg-cuffed to the table during testimony of two of his intended victims precluded a finding that the shackling during the *penalty phase* was harmless.

In *State v. Damon* we concluded that the unjustified placing of defendant in a restraint chair during trial was prejudicial and that the trial court's error in ordering the restraint was not harmless. We stated that "[b]ecause the jury must have observed that the defendant was being restrained and that the restraints were unusual, . . . the defendant has satisfied his burden to show that the restraints influenced the jury's verdict."[123] We concluded the error was not harmless because the defendant offered credible testimony to support his diminished capacity defense and the State's testimony was not so overwhelming that it would require a verdict of "guilty."[124]

In *Rhoden v. Rowland*,[125] the Court of Appeals for the Ninth Circuit concluded that the defendant's visible and unjustified shackling throughout the entire trial was prejudicial. The court held there was a strong likelihood of prejudice because five jurors actually saw the shackles during trial, at least two jurors remembered other jurors making comments to them about the shackles, and the defendant provided evidence that the shackles caused him physical and emotional pain. In concluding the shackling error was not harmless, the court found that "the shackles

---

[123] *State v. Damon*, 144 Wn.2d 686, 693, 25 P.3d 418 (2001).

[124] *Id.* at 695.

[125] 172 F.3d 633 (9th Cir. 1999).

essentially branded [the defendant] as having a violent nature in a case where his propensity for violence was the crucial issue," and that the "evidence on this issue was disputed" and "the jurors deliberated for over nine hours over three days, which suggests that [the jury] did not find the case to be clear-cut."[126]

In *Clark*, we held that the defendant was not prejudiced when the jury saw him shackled on the first day of voir dire and on the day the verdict was returned, but the defendant sat unrestrained throughout the trial. We found the error in shackling the defendant was harmless beyond a reasonable doubt

> [b]ecause the impact of shackling on the presumption of innocence is the overarching constitutional concern, it would logically follow that in the minds of the jurors [defendant's] shackling on the first day of voir dire was more than logically offset by over the two weeks of observing [defendant] in the courtroom without shackles. . . . Furthermore the presumption of innocence was not at stake on the day the verdict was read because the jury had already judged [defendant] guilty. . . .[127]

We also found the error in shackling the defendant during the *sentencing phase* of his trial did not prejudice him and was harmless beyond a reasonable doubt because the trial court made certain the defendant "was not moved in or out of the [court]room in the presence of the jury, both counsel tables had protective skirts, the shackles were taped to eliminate any noise, and the jury never saw [defendant] in motion during the guilt phase."[128]

 A jury's brief or inadvertent glimpse of a defendant in restraints inside or outside the courtroom does not

---

[126] *Id.* at 637 (citations omitted); *see also Spain v. Rushen*, 883 F.2d 712 (9th Cir. 1989) (the trial court abused its discretion in permitting the painful shackling of defendant's hands for 17 months because it should have considered the alternative of excluding the defendant from the courtroom for periods of time); *Tyars v. Finner*, 709 F.2d 1274, 1284-85 (9th Cir. 1983) (the visible and unjustified restraining of defendant during involuntary commitment proceedings was inherently prejudicial).

[127] *State v. Clark*, 143 Wn.2d 731, 776, 24 P.3d 1006 (2001) (citation omitted).

[128] *Clark*, 143 Wn.2d at 777; *see also Elmore*, 139 Wn.2d at 274 (defendant was not prejudiced when the jury saw him shackled on the first day of voir dire examination of the jury); *Ollison*, 68 Wn.2d at 68-69 (defendant was not preju-

necessarily constitute reversible error. Such circumstances are not inherently or presumptively prejudicial and do not rise to the level of a due process violation absent a showing of actual prejudice.[129]

(b) Ineffective assistance of counsel

 Petitioner argues he had ineffective assistance of counsel during both the *guilt phase* and *penalty phase* of his trial because his counsel did not object to Petitioner being shackled and then did not prevent the jury from seeing the ankle shackles. We must therefore determine whether this made counsel's representation of Petitioner unreasonable and, if so, whether it is likely the jury would not have found Petitioner "guilty" and not imposed the death penalty.

Where there is overwhelming evidence of guilt, on appeal, unconstitutional shackling has been held to be harmless.[130] Because this matter comes to us as a collateral attack, after defendant has been convicted and exhausted his appeal rights, the defendant is *not* entitled, as he would have been on appeal, to a presumption of prejudice which the state would have to overcome by evidence beyond a reasonable doubt. Rather, the defendant bears the burden of showing *actual* prejudice. As this court noted, "Personal restraint petitions are not a substitute for appeal."[131]

> "It has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment. The reasons for

---

diced when outside the courtroom prospective jurors may have seen defendant handcuffed); *Ghent*, 279 F.3d at 1133 (there was no prejudice because the defendant was not shackled in open court during any of the proceedings); *United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995); *United States v. Halliburton*, 870 F.2d 557, 560-61 (9th Cir. 1989); *Wilson v. McCarthy*, 770 F.2d 1482, 1485-86 (9th Cir. 1985) (a jury's brief inadvertent observation of a defendant in custody does not compel reversal in the absence of an affirmative showing of actual prejudice).

[129] *Clark*, 143 Wn.2d 731.

[130] *Clark*, 143 Wn.2d at 775-76.

[131] *In re Pers. Restraint of Mercer*, 108 Wn.2d 714, 720, 741 P.2d 559 (1987) (citation omitted).

narrowly limiting the grounds for collateral attack on final judgment are well known and basic to our adversary system of justice."[132]

In a personal restraint petition, the inquiry is "whether the petitioner is able to show that, more likely than not, he was actually and substantially prejudiced. . . ."[133]

 It is the responsibility of defense counsel to raise an objection to physical restraints. Despite the admonition to trial courts to weigh on the record the reasons for restraining an accused in the courtroom, in *Elmore* we did not "relieve defense counsel of the obligation *to object* or request a curative instruction regarding shackling."[134] In that case, the defendant, who had agreed to appear in "jail garb" as part of his strategy of acknowledging responsibility for his crime, showed up for jury selection during his sentencing in shackles. Defense counsel was surprised by the shackles but agreed to leave them on that first day of voir dire examination. The defendant did not appear under physical restraint again for the remainder of the proceeding.

In this case, the State concedes Petitioner was restrained by ankle shackles throughout trial and sentencing.[135] During the first trial before Judge Sebring, counsel did object to Petitioner being shackled, stating:

> My understanding is that it's the intention of the jail staff to have Mr. Davis . . . with ankle shackles on during the course of trial. We are opposed to that. I think it's highly prejudicial, and the case law indicates that unless the defendants have shown

---

[132] *Id.* (quoting *United States v. Addonizio*, 442 U.S. 178, 184, 99 S. Ct. 2235, 60 L. Ed. 2d 805 (1979)).

[133] *Id.* at 718.

[134] *Elmore*, 139 Wn.2d at 273 (emphasis added); *see also Rodriguez*, 146 Wn.2d at 272 (defense counsel must object to witness' appearance in shackles or request a curative instruction to the jury; a trial judge is not required to conduct a security hearing sua sponte).

[135] State's Resp. to Pet'r's Am. Pers. Restraint Pet. at 79. Judge Sebring failed to conduct the proper inquiry under *State v. Hartzog*, 96 Wn.2d 383, 635 P.2d 694 (1981) as to whether in petitioner's case shackling was necessary.

some inclination of being troublesome or escape prone or whatever that ankle shackles should not be allowed . . . .[136]

Judge Sebring advised counsel that his orders and rulings "remain in effect, unless or until modified by the new trial judge."[137] Defense counsel made no objection to the ankle restraints during the second trial before Judge Fleming after the mistrial was granted.

In not timely objecting to the shackling of Petitioner during the new trial, defense counsel may have waived any objection. Judge Fleming did not order Petitioner shackled in Petitioner's second trial. Petitioner was not *compelled* to appear in court in physical restraints.[138] However, failure of counsel to object to shackling of Petitioner "is sufficient to negate the presence of compulsion necessary to establish a constitutional violation."[139] Therefore, petitioner argues that his defense counsel's failure to object to shackling during the new trial presided over by Judge Fleming was ineffective assistance of counsel. Assuming that the failure to object was deficient performance, Petitioner still bears the burden of proof that his counsel's failure to object resulted in actual and substantial prejudice. In the *guilt phase* of the trial, the question to be answered is "whether there is a reasonable probability that, absent the error[ ], the factfinder would have had a reasonable doubt respecting guilt."[140]

Petitioner Davis cannot establish actual and substantial prejudice from his shackling during the *guilt phase* of his trial. Because there was overwhelming evidence of his guilt, he cannot show there was a reasonable probability that, *but for* his counsel's deficient performance by not objecting, the outcome of his trial would have been different.

---

[136] *See* 1 VRP (*State v. Davis*, No. 97-1-00432-4) (Nov. 3, 1997) at 6.

[137] CP at 520-21.

[138] The dissent by Justice Sanders misconstrues the majority. The majority did not find error by Judge Fleming in that the defendant was not in shackles upon an order of Judge Fleming. Any error by Judge Sebring was irrelevant once the mistrial was declared.

[139] *See Williams*, 425 U.S. at 512-13.

[140] *Strickland v. Washington*, 466 U.S. 668, 695, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

There was overwhelming evidence to support a finding of guilt in this case. At trial, the jury heard testimony establishing Petitioner's opportunity and motive to commit the crime and placing him in Ms. Couch's home at the time of her death. The jury heard from Keith Burks, Petitioner's friend, that codefendant George Anthony Wilson and Petitioner went to Ms. Couch's residence to "rob the old lady" and that Mr. Wilson decided to leave after Petitioner started touching Ms. Couch.

The jury heard from witnesses who testified that the day after the death, Petitioner had several items which had not been observed in his possession the day before, including cash, a gold wedding band, cigarettes, and various drink and food products which were connected with Ms. Couch. The cigarettes and food items were obtained from a military commissary to which Petitioner had no access but where Ms. Couch routinely shopped. Witnesses also testified that Petitioner disclosed information about the killing which had not yet been revealed to the public. Shelbey B. Johnson, a prisoner housed with Petitioner in the Pierce County Jail, testified that Petitioner was adamant he did not rape Ms. Couch, but said, "I may have killed her, but I didn't rape her."

Testimony from family members described how, on the day Ms. Couch's body was discovered, Petitioner meticulously cleaned the downstairs area of his residence. Petitioner threw some items into a garbage bag in the backyard, and at least twice washed the clothing he wore on the night of Ms. Couch's death.

The jury heard how police authorities recovered two latent fingerprints from a garbage bag located next to the door leading out to the patio area behind Petitioner's residence. One fingerprint, matching Petitioner's left ring finger, was taken from an empty beer carton. The second fingerprint, lifted from an empty cigarette carton, matched Ms. Couch's left thumb.

There was forensic evidence connecting Petitioner to the crime. Blood found on Petitioner's shoe was consistent with

Ms. Couch's DNA. Chemicals found in Comet cleanser were also discovered on Petitioner's shoes. Comet had been spread all over the crime scene. While Petitioner's hair samples did not specifically identify him as the source of the hairs recovered from the Couch residence, his hair sample could not be eliminated as a source. In contrast, codefendant Wilson's hair samples were microscopically dissimilar.

 In the penalty phase, the question is different: "[W]hether there is a reasonable possibility that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland v. Washington*, 466 U.S. 668, 695, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Prejudice is shown when there is a reasonable probability that, absent the error, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." [141]

During the *penalty phase* of the trial, Petitioner offered evidence for the jury to consider in determining whether he merited leniency. His family members testified that they still loved him despite his conviction.[142] His mother, Ms. Taylor, testified that his three children, ages 3, 17, and 19, loved him. There was also testimony about Petitioner's troubled childhood. Testimony was offered that when Petitioner was growing up, he would frequently fight with other children, including his six siblings, because they perceived him as being "slower" in his mental capabilities than they were.[143] Petitioner's "inability to articulate contributed to his receiving a greater amount of corporal punishment at home, at the hands of an allegedly abusive surrogate father figure, and his exclusion from group activities by other children."[144] Petitioner also offered testimony from a jail

---

[141] *Id.*

[142] *State v. Davis*, 141 Wn.2d 798, 875-76, 10 P.3d 977 (2000).

[143] *Id.* at 876.

[144] *Id.*

representative to illustrate Petitioner's ability to do well while incarcerated. Petitioner "had not incurred any major infractions while in custody since early 1997."[145] Petitioner showed no remorse.

Petitioner provided mitigating evidence from two mental health experts, Lloyd I. Cripe, Ph.D., and Robert B. Olsen, M.D. Dr. Cripe testified that Petitioner had an IQ of 81, "which placed him in the 'dull-normal' lower end range of intelligence."[146] Dr. Cripe testified that Petitioner had impaired neurobehavioral functioning as a result of his learning disability, his military service which resulted in a closed head injury, his drug and alcohol abuse, and his diabetic condition.[147] Dr. Olsen also referred to Petitioner's "history of diabetes, chronic alcohol and cocaine abuse and a progressive decline of complex mental functioning between 1994 and 1997."[148] It was his opinion that Petitioner "suffered from certain antisocial, borderline and schizotypal personality disorders."[149]

The jury found Petitioner "guilty" of aggravated first degree murder, identifying three alternate aggravating factors: that Petitioner killed Ms. Couch in the course of, in furtherance of, or in immediate flight from (1) a robbery in the first or second degree, (2) a rape in the first or second degree, or (3) a burglary in the first or second degree.

The jury was informed about Petitioner's extensive criminal history, which showed a pattern of violence toward others. His record included prior convictions for (1) robbery in the second degree in 1986, (2) perjury in the second degree in 1986, (3) assault in the fourth degree in 1988, (4) assault in the second degree in 1990, (5) criminal trespass in the first degree in 1990, (6) driving without a valid operator's license in 1992, (7) driving without a valid

---

[145] *Id.*

[146] *Id.* at 877.

[147] *Id.*

[148] *Id.*

[149] *Id.*

operator's license in 1993, (8) theft in the third degree in 1992, and (9) violation of a domestic violence pretrial no-contact order in 1995.

 As we observed in *State v. Finch*,[150] a conclusion that the error in shackling a defendant is harmless in the *guilt phase* of a capital case does not resolve the question whether such error is harmless in the *penalty phase* of the trial. In the penalty phase a defendant's character is very much at issue and the evidence the jury considers then is of a more subjective nature than during the *guilt phase*. In the penalty phase of the trial, "future dangerousness or the probable lack of future dangerousness of the defendant is a relevant factor for a jury's consideration."[151] Finch wore shackles throughout trial and the special sentence proceeding. And during the testimony of two of the witnesses, Finch's right hand was handcuffed to his chair and his shackles handcuffed to the table leg. A special skirt was placed around the defense counsel's table to conceal the shackles. However, during voir dire, Finch asked the "trial court to remove the skirting around counsel table."[152] Finch made the request after he was brought into the hearing room in shackles in front of potential jury members. The skirts were permanently removed.[153] All the jurors in *Finch* clearly saw Finch restrained and shackled during both the guilty and penalty phases.

The reference hearing clarified that only one juror saw Davis in shackles for brief glimpses on two occasions during the guilt phase. No jurors saw Davis in shackles during the penalty phase. Although there is no evidence that any juror saw Petitioner in shackles during the penalty phase, we cannot be assured that any negative inference as to Petitioner's character was cured. In the penalty phase, the question is whether there is a reasonable probability that,

---

[150] 137 Wn.2d 792, 975 P.2d 967 (1999).

[151] *Id.* at 864.

[152] *Id.* at 854.

[153] Id. at 855.

"absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[154] As we stated in *Finch*:

> Here, the issue is the possible impact which shackling the Defendant may have had on the sentencing decision, particularly in connection with the question of future dangerousness. It is undisputed that placing the [D]efendant in restraints indicates to the jury that the Defendant is viewed as a "dangerous" and "unmanageable" person, in the opinion of the court, who cannot be controlled, even in the presence of courtroom security. The Eleventh Circuit has emphasized that "a jury might view the shackles as first hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision." *Elledge [v. Dugger]*, 823 F.2d [1439,] at 1450 [(11th Cir. 1987)].[155]

Although the opportunity to observe Davis in shackles was partial and fleeting as compared to the facts of *Finch*, the balance must tip in Davis's favor in the penalty phase given the difference in the nature of the inquiry. Therefore, we remand for a new trial in the *penalty* phase.

### FAILURE TO VOIR DIRE JURY ON RACE

*ISSUE (2). Whether defense counsel's decision not to question prospective jurors about racial bias on voir dire violated Petitioner's right to counsel under the sixth and fourteenth amendments to the United States Constitution.*

Petitioner contends his trial counsel were constitutionally ineffective because they did not question prospective jurors about racial bias during voir dire examination. Petitioner, an African American, was accused of killing Ms. Yoshiko Couch, an Asian/Japanese American. There were

---

[154] *Strickland*, 466 U.S. at 695.

[155] 137 Wn.2d at 863.

no African Americans on the jury.[156]

On the first day of voir dire, which extended over nine days and began with a panel of 120 prospective jurors, the trial court instructed the jury venire that the "purpose of voir dire examination was to select an 'impartial jury,' which would decide the case solely 'upon the law and the facts,' " and "one that is 'unbiased and without preconceived ideas which might affect the case.' "[157] The court also distributed to the panel a juror questionnaire which indicated the African American race of Petitioner and his codefendant.[158]

The trial court allowed both parties to question prospective jurors.[159] "The questioning dealt primarily with their willingness to impose the death penalty, but each juror was questioned about other matters as well, particularly if the juror responded affirmatively to any of the questions on the jury questionnaire."[160] Ms. Couch's race was not indicated on the questionnaire.[161]

The subject of "race" was mentioned by the prosecuting attorneys 13 times during voir dire.[162] Of the prospective jurors questioned about race, four were selected to serve.[163] "No prospective jurors indicated they had racial bias or prejudice that would impair their ability to render a decision in the case based solely upon the law and the evidence."[164] Defense counsel did not ask prospective jurors any questions relating to racial prejudice.[165] However,

---

[156] *Davis*, 141 Wn.2d at 826.

[157] *Id*. at 835 n.220.

[158] *Id*. at 835-36 & n.221.

[159] *Id*. at 827.

[160] *Id*. at 836 (footnote omitted).

[161] *Id*. at 827.

[162] *Id*.

[163] The jurors selected were numbers 6, 16, 18, and 20. *Id*. at n.178.

[164] *Id*. at 836.

[165] *Id*. at 837.

there were many questions relating to general bias. At the end of voir dire, "[a]ll the jurors selected were Caucasian."[166]

The attorneys on neither side raised "the issue of race during the remainder of the trial."[167] During trial, the prosecution introduced forensic evidence that hairs with "Negroid" characteristics recovered from the crime scene belonged to Petitioner. The State also presented evidence that the Couch family kept to themselves and had no African American friends who visited their home.

Petitioner's lead defense counsel, Lloyde Alton, in his declaration submitted with this petition, stated:

> There were only two African-Americans in the jury venire, one man and one woman. We wanted to seat African-American jurors on the jury if we could. However, after reviewing the jury questionnaire and voir dire, we determined that he would not make a good juror. We very much liked the female African-American juror and we desperately wanted her on the jury. However, her juror number was too high and we never reached her before all challenges for cause and peremptories had been exercised.[168]

Petitioner's other defense counsel, Ms. Julia Lindstrom, submitted a declaration in which she notes that:

> To the best of my recollection, we asked questions about race and racial prejudice during voir dire and jury selection. I also believe the State asked similar questions. If the record does not reflect these questions were asked, I have no recollection of a reason why. I do not recall the racial composition of the jury.[169]

Declarations from the 12 seated jurors indicate that none of them recall discussing the race of either Petitioner, his codefendant, or Ms. Couch.[170]

---

[166] *Id.*

[167] *Id.*

[168] Decl. of Lloyde Alton at 7-8.

[169] Decl. of Julia Lindstrom at 3.

[170] State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 785-809.

On direct appeal, Petitioner argued that the trial court erred in not sua sponte questioning prospective jurors concerning racial bias during voir dire. Relying on *Turner v. Murray*,[171] which holds that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias,"[172] we rejected Petitioner's argument[173] and placed the burden on defense counsel to voir dire on the subject of racial prejudice. In response to Petitioner's argument, we stated that "[t]he decision whether to raise the issue of race, considering the effect such questioning may have in unnecessarily bringing it to the attention of the jurors, is best left to defense counsel."[174]

Petitioner now claims that because the crime in this case was "interracial," his trial counsel provided ineffective assistance by not taking advantage of *Turner* and not asking specific race-related questions of prospective jurors to identify any racial bias. *Turner* does not support Petitioner's claim. In that case, the trial court declined to allow questioning on racial bias after defense counsel requested it. The United States Supreme Court indicated that a trial court in a capital case is not required to raise the question of racial bias sua sponte and that the appropriateness of such questioning is within the discretion of counsel.[175] *Turner* does not support a conclusion that a defense lawyer's failure to have jurors informed of the victim's race and

---

[171] 476 U.S. 28, 37 n.10, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986) ("Should defendant's counsel decline to request *voir dire* on the subject of racial prejudice, we in no way require or suggest that the judge broach the topic *sua sponte*.").

[172] *Turner*, 476 U.S. at 36-37.

[173] *Davis*, 141 Wn.2d at 838-39 ("Under *Turner*, a trial court in a capital case need not question prospective jurors sua sponte during voir dire nor instruct the jury to disregard racial considerations where a defendant has not asked for it or for an opportunity to question prospective jurors concerning it.").

[174] *Id.* at 839.

[175] 476 U.S. at 37 n.10.

questioned concerning their feelings about interracial crime is of itself proof of deficient performance.[176]

Simply because this could be characterized as an "interracial crime" because it involved an African American male and an Asian/Japanese American female does not mean that trial counsel was deficient in not questioning prospective jurors about possible racial prejudice. Contrary to Petitioner's suggestions, this case was not fraught with racial tensions. Neither of Petitioner's counsel considered the killing of Ms. Couch racial in nature.[177] In our prior decision on direct review we found "[t]here is no evidence in the record to suggest that [Petitioner] was singled out because of his race."[178]

■ Under the circumstances, defense counsel acted within the range of reasonable and competent assistance of counsel. Both lawyers asked general questions about bias, a technique which was perhaps tactically sound.[179] Petitioner has not established the absence of a legitimate strategic or tactical reason for his counsel not to question prospective jurors about race.

Even though we need not determine whether counsel's decision not to inquire into racial bias of prospective jurors on voir dire amounted to deficient performance, we need not at any rate decide the question because Petitioner has not established prejudice under the second element of the *Strickland* test. He cannot show that his counsel's approach during voir dire prejudiced him. He merely points out that he was tried by a jury with no African American members. He has not established that racial bias played any part in his conviction. In our decision on Petitioner's direct appeal, we noted that there was substantial evidence to support a

---

[176] *See, e.g., Lear v. Cowan*, 220 F.3d 825, 829 (7th Cir. 2000).

[177] Decl. of Mr. Alton and Ms. Lindstrom.

[178] *Davis*, 141 Wn.2d at 838.

[179] *Lear*, 220 F.3d at 829 (asking general questions about bias "may have been a better method of eliciting reactions to the interracial character of the crime than playing up the interracial issue, especially since there is no suggestion that the crime had a racial *motive*").

finding of guilt in this case. There is nothing in the record to suggest the jury improperly considered race in reaching its verdict.

 Petitioner cannot demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[180]

### FAILURE TO SEEK SEPARATE TRIAL FROM CODEFENDANT

*ISSUE (3). Whether Petitioner was deprived of effective assistance of counsel when his counsel did not move to sever his trial from that of his codefendant on the grounds of antagonistic defenses.*

Petitioner asserts he was denied effective assistance of counsel because his attorneys did not move to sever his trial from that of his codefendant, George Anthony Wilson, on the grounds of mutually antagonistic defenses.[181] He argues that evidence was introduced by Mr. Wilson's attorney, Keith MacFie, which illustrated antagonistic defenses.

Petitioner cites two instances. The first was when, in response to questioning by Mr. MacFie, Keith D. Burks, who had previously testified about the events on the morning of the killing as told to him by codefendant Wilson, testified the reason he lied to police authorities was because he was scared of Petitioner.[182] The second instance was when Mr. MacFie attempted to elicit testimony from Ms. Jessica Cunningham, Petitioner's niece, that Mr. Wilson told her "[Petitioner] is on a killing spree." But the trial court did not allow that testimony.[183]

---

[180] *Strickland*, 466 U.S. at 694.

[181] Petitioner did move for severance from the trial of his codefendant George Anthony Wilson under CrR 4.4(c)(1) on the grounds that the State intended to introduce out-of-court statements by Mr. Wilson which implicated Petitioner. *Davis*, 141 Wn.2d at 851-52; *see also* CP at 66-76. His motion was denied by the trial court. *Davis*, 141 Wn.2d at 852.

[182] *Davis*, 141 Wn.2d at 810-11.

[183] Report of Proceedings (RP) at 1811.

Petitioner relies primarily on events during closing arguments to demonstrate his claim of irreconcilable conflicting defenses in his and Mr. Wilson's cases. During closing argument in the *guilt phase*, Mr. Wilson's counsel stated:

> We have no sympathy for Cecil Davis whatsoever. The State has shown that Mrs. Couch's door was kicked in. She was grabbed. She was taken upstairs. She was violated and beaten in various portions of the house, two bedrooms and the bathroom. The State has shown through evidence against Mr. Davis that it was not a crime that just suddenly happened. . . .[184]
>
> . . . .
>
> We know what Cecil Davis was doing, he was over at Yoshiko Couch's house murdering her. But we don't know what Anthony Wilson was doing unless we take a look at the testimony of Keith Burks.[185]

 To prove he was prejudiced by his joint trial with codefendant Wilson, Petitioner must show that a competent attorney would have moved for severance, that the motion likely would have been granted, and that if he were tried separately there was a reasonable probability he would have been acquitted.[186]

 ██ Under CrR 4.4(c)(2)(i), a trial court has broad discretion to grant a severance when "it is deemed appropriate to promote a fair determination of the guilt or innocence of a defendant."[187] Separate trials are not favored in Washington because of concerns for judicial economy, "[f]oremost among these concerns is the conservation of judicial resources and public funds."[188]

 ██ A defendant seeking to sever trial from a codefendant has "the burden of demonstrating that a joint trial would be so manifestly prejudicial as to outweigh the

---

[184] RP at 2267.

[185] *Id.* at 2271.

[186] *State v. McFarland*, 127 Wn.2d 322, 337 & n.4, 899 P.2d 1251 (1995).

[187] *State v. Dent*, 123 Wn.2d 467, 484, 869 P.2d 392 (1994); *see also State v. Hoffman*, 116 Wn.2d 51, 74, 804 P.2d 577 (1991).

[188] *State v. Bythrow*, 114 Wn.2d 713, 723, 790 P.2d 154 (1990).

concern for judicial economy."[189] The mere existence of antagonism between defenses[190] "or the desire of one defendant to exculpate himself by inculpating a codefendant . . . is insufficient to [compel separate trials]."[191] To be entitled to severance because of antagonistic defenses, a defendant must show "that the conflict is so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty."[192]

Even assuming that a competent attorney would have moved to sever the trial based on antagonistic defenses, Petitioner cannot show that the trial court would have granted the motion in his case.[193] He cannot demonstrate that a joint trial would have been so "manifestly prejudicial" as to outweigh the concern for judicial economy.

 Codefendant Wilson did not offer any evidence that he was innocent and that Petitioner was responsible for the crime. Most of the "finger-pointing" by Mr. Wilson's counsel occurred during closing arguments. Closing arguments, however, are not evidence, and the jury was instructed that "[t]he only evidence . . . to consider consists of the testimony of the witnesses and the exhibits admitted into evidence."[194]

 Petitioner also has not shown he was prejudiced by a joint trial. If severance had been granted in this case, the evidence presented at a separate trial for Petitioner would

---

[189] *Hoffman*, 116 Wn.2d at 74.

[190] *Id.*

[191] *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996).

[192] *Hoffman*, 116 Wn.2d at 74; *see also Throckmorton*, 87 F.3d at 1072 ("[A] defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant.").

[193] *Strickland*, 466 U.S. at 697 (There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.); *see also State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996) ("[I]f either part of the test is not satisfied, the inquiry need go no further.").

[194] CP at 845 (Jury Instruction 1).

have been the same as was presented at his joint trial. In addition, the trial court gave an appropriate limiting instruction.[195] Petitioner cannot show there was a reasonable probability the result in the *guilt phase* of his trial would have been different if he had been tried separately.

*FAILURE TO OBJECT TO INTRODUCTION OF IRRELEVANT VICTIM IMPACT TESTIMONY*

*ISSUE (4). Whether trial counsel's decision not to object to two comments introduced into evidence concerning the victim's surviving husband constituted deficient performance.*

Petitioner argues his counsel was ineffective by not objecting to introduction into evidence of irrelevant comments concerning Ms. Couch's surviving husband, Richard Couch. During the *guilt phase* of the trial, Ms. Jolene Davis, a member of the Tacoma Fire Department, testified without objection that while she was at the crime scene "Mr. Couch was extremely upset, distraught."[196] Ms. Diana Rodriguez, the Couches' daughter, testified without objection that her father's existing poor medical condition worsened after her mother was killed[197] and that he died on October 12, 1997.[198]

---

[195] *State v. Grisby*, 97 Wn.2d 493, 509, 647 P.2d 6 (1982); *see also Zafiro v. United States*, 506 U.S. 534, 540-41, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) ("[E]ven if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and 'juries are presumed to follow their instructions.'") (quoting *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987)); *State v. Standifer*, 48 Wn. App. 121, 737 P.2d 1308 (1987).

Jury instruction 22 read:

A separate crime is charged against each defendant. The charges have been joined for trial. You must consider and decide the case of each defendant separately. Your verdict as to one defendant should not control your verdict as to the other defendant.

All of these instructions apply to each defendant, unless a specific instruction states that it applies only to a specific defendant.

CP at 872.

[196] RP at 1269.

[197] *Id.* at 1312.

[198] *Id.* at 1311.

■ To prove that failure to object rendered counsel ineffective, Petitioner must show that not objecting fell below prevailing professional norms,[199] that the proposed objection would likely have been sustained,[200] and that the result of the trial would have been different if the evidence had not been admitted.[201] To prevail on this issue, Petitioner must rebut the presumption that counsel's failure to object "can be characterized as *legitimate* trial strategy or tactics."[202] Although deliberate tactical choices may constitute ineffective assistance of counsel if they fall outside the wide range of professionally competent assistance, "exceptional deference must be given when evaluating counsel's strategic decisions."[203]

■ Petitioner has not established that the State was attempting to elicit improper victim impact evidence. Even assuming the testimony of Ms. Davis and Ms. Rodriguez constituted objectionable victim impact evidence, defense counsel's decision not to object can be characterized as legitimate trial strategy or tactics. Counsel may not have wanted to risk emphasizing the testimony with an objection.[204] Petitioner has not rebutted the presumption that a tactical reason existed for defense counsel not to object.

---

[199] *State v. Townsend*, 142 Wn.2d 838, 847, 15 P.3d 145 (2001).

[200] *McFarland*, 127 Wn.2d at 337 n.4; *Hendrickson*, 129 Wn.2d at 80.

[201] *Hendrickson*, 129 Wn.2d at 80.

[202] *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002) (emphasis added); *see also Thompson v. Calderon*, 109 F.3d 1358, 1364-65 (9th Cir. 1996) ("Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances.").

[203] *McNeal*, 145 Wn.2d at 362.

[204] *See, e.g., State v. Donald*, 68 Wn. App. 543, 551, 844 P.2d 447 (1993) ("[T]rial counsel decided not to ask for a limiting instruction as a trial tactic so as not to reemphasize this very damaging evidence.").

### FAILURE TO MAKE AN OPENING STATEMENT

*ISSUE (5). Whether Petitioner received ineffective assistance of counsel because his counsel did not make an opening statement in the guilt phase of the trial.*

Petitioner claims his trial counsel was ineffective for not making an opening statement at the beginning of his trial. Initially Ms. Lindstrom reserved the right to make an opening statement, but ultimately she and Mr. Alton decided not to present one.

■ A defense counsel's decision to waive an opening statement does not constitute deficient performance under the *Strickland* test.[205] Trial counsel has the option of making an opening statement. Petitioner has cited no authority that an opening statement is required. Competent counsel may waive an opening statement as a strategic trial tactic.[206]

Even if the decision to waive an opening statement was not a tactical one, Petitioner has not demonstrated he was prejudiced by the absence of an opening statement. The decision by defense counsel not to make an opening statement did not constitute ineffective assistance of counsel.

### FAILURE TO OBJECT TO PROSECUTING ATTORNEY'S CLOSING ARGUMENT

*ISSUE (6). Whether defense counsel's decision not to object to statements by the prosecutor during closing argument constituted deficient performance.*

---

[205] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Stockman*, 70 Wn.2d 941, 945, 425 P.2d 898 (1967) ("[I]t would . . . be a question of trial strategy when and whether an opening statement should be made."); *see also United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458 (9th Cir. 1985) ("The timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffectiveness of counsel.").

[206] *See, e.g., Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965) (Trial counsel's decision not to make an opening statement "was a matter of professional judgment, and . . . was very likely the wiser course to follow" because of the strong case against the defendant.).

Petitioner argues that his defense attorneys were ineffective because they did not object during the prosecutor's closing argument in the *guilt phase*.[207] He contends that during summation, the prosecuting attorney made various improper statements and comments intended to appeal to the passions of the jury. Petitioner lists several excerpts of alleged improper comments. However, except in two instances, he does not state any reasons why the statements were improper.

According to Petitioner, his counsel should have objected to the prosecutor's claim that "the victim's blood was found on Petitioner's shoe" because that comment was unsupported by the evidence.[208] He also argues that his attorney should have objected when the State suggested to the jury that Petitioner "ought to have a label with a skull and crossbones" because that inflammatory comment implied Petitioner was something less than a human being.

■■■ Generally "[t]he prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury."[209] A prosecuting attorney has a duty to the public " 'to act impartially in the interest only of justice,' "[210] and "may not make heated partisan comments which appeal to the passions of the jury in order to procure a conviction at all hazards."[211]

In this case, the State's closing argument was proper. The first alleged improper comment by the prosecutor is taken out of context by Petitioner. The prosecutor told the jury:

---

[207] Petitioner made a similar argument, which we rejected, in his direct appeal, claiming prosecutorial misconduct in statements by prosecuting attorneys during the *penalty phase* of the trial.

[208] Pet'r's Am. Pers. Restraint Pet. at 84.

[209] *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997).

[210] *State v. Reed*, 102 Wn.2d 140, 147, 684 P.2d 699 (1984) (quoting *People v. Fielding*, 158 N.Y. 542, 547, 53 N.E. 497 (App. Div. 1899)).

[211] *State v. Rivers*, 96 Wn. App. 672, 675, 981 P.2d 16 (1999) (citing *Reed*, 102 Wn.2d at 147).

Now, Dr. Kean cannot say with 100 percent certainty that it's the victim's blood, Yoshiko Couch's. Dr. Kean is limited by the nature of her science. It's as if she has blinders on and she's saying well, based on this I can't say it is, but you can say that it isn't. Dr. Kean doesn't have the privilege and duty to consider the totality of the evidence. She's obviously not going to be asked the question to consider all of the evidence and tell us whether it is the victim's blood, but you can consider that and you can decide that. And the State says to you that there is no doubt that it's her blood.[212]

The prosecutor's second comment was not inflammatory when he said Petitioner "ought to have a label with a skull and crossbones because he's just as lethal as that [x]ylene," referring to xylene toxicity, which was one of the causes of Ms. Couch's death. The State was simply alluding to Petitioner as a person who killed with xylene poison.

 Defense counsel's decision to refrain from objecting during the prosecutor's closing argument was not deficient performance. Lawyers do not commonly object during closing argument "absent egregious misstatements."[213] A decision not to object during summation is within the wide range of permissible professional legal conduct.[214]

*FAILURE TO EFFECTIVELY CROSS-EXAMINE MS. DIANA RODRIGUEZ*

*ISSUE (7). Whether Petitioner's right to counsel under the sixth and fourteenth amendments to the United States Constitution was violated when his counsel did not cross-examine the Couches' daughter concerning a statement she had made to police authorities prior to their execution of a search warrant.*

Petitioner next claims his counsel's cross-examination of Ms. Diana Rodriguez, the Couches' daughter, was deficient. He argues that his counsel did not effectively question Ms. Rodriguez about her mother's missing wedding ring.

---

[212] RP at 2210-11.

[213] *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993).

[214] *Strickland*, 466 U.S. at 689.

On January 25, 1997, the day of Ms. Couch's death, Petitioner offered to sell a gold wedding band to his mother for $10.[215] She declined and returned it to him. Ms. Lisa Hubley, Petitioner's niece, observed him wearing a gold wedding band on his "pinky" finger. Four days later, police officers executed a search warrant at Petitioner's residence. Although they recovered several items linking Petitioner to the killing of Ms. Couch, they did not recover a gold wedding band.

In the affidavit used to obtain the search warrant of Petitioner's residence, Detective Tom Davidson, Tacoma Police Department, described an interview between Ms. Rodriguez and Detective John Pike. Referring to that interview, he stated:

> During a conversation with Diana Rodriguez, Detective Pike learned that victim Yoshiko had purchased some Budweiser beer and cola soft drinks for her home during the holidays. Diana Rodriguez also indicated that her mother had lost her wedding band several years ago and had obtained another one and this one was now in Diana's possession, but she did not know if her mother had found the one that had been lost and she could not rule out the possibility that another wedding band exists.[216]

While cross-examining Detective Davidson at trial, defense counsel asked a question which was answered as follows:

> Q: Did you, based on your investigation and your discussions with various witnesses, indicate in that affidavit to the court that *although Mrs. Couch had a wedding ring, Ms. Rodriguez now had that in her possession*?
>
> A: It was information I had obtained from Detective Pike. I did not talk with Ms. Rodriguez.

---

[215] *State v. Davis*, 141 Wn.2d 798, 820, 10 P.3d 977 (2000).

[216] Pet'r's Am. Pers. Restraint Pet. at 73; State's Resp. to Pet'r's Am. Pers. Restraint Pet. at 128.

Ms. Lindstrom: Okay. Thank you. I'll ask Detective Pike about it. I don't have any other questions of the detective, Your Honor.[217]

The State introduced a photograph developed in June 1996 which depicted Ms. Couch wearing a gold wedding band on her left ring finger.[218] During closing argument, the prosecutor referred to the missing ring and to testimony that Petitioner was seen with a gold wedding band the same day Ms. Couch was killed.

In her declaration filed with this petition, defense counsel Ms. Julia Lindstrom stated:

> Prior to trial, I did not interview the victim's daughter, Diana Rodriguez, nor did I interview Detective John Pike. To the best of my knowledge, neither did my co-counsel Lloyde Alton. I cannot recall if there was a tactical reason for our decision not to interview Detective Pike. I recall discussing with Mr. Alton whether we should interview Ms. Rodriguez. We decided not to interview her because we knew if Mr. Davis were convicted she would be called to testify in the penalty phase. We did not want to create any hostility or antagonism if there was a possibility that she, in spite of the death of her mother, might not want to see Mr. Davis executed.
>
> . . . .
>
> At trial I did not cross examine Ms. Rodriguez concerning the statement she made to the police that her mother's wedding ring had been lost several years prior to the murder and that Ms. Rodriguez had the replacement ring in her possession. This statement is referred to in Detective Davidson's affidavit for search warrant of Cecil Davis' mother's house, a copy of which was in my possession prior to the time that Ms. Rodriguez took the stand, Detective Davidson incorporated the information about the victim's ring being in Ms. Rodriguez's possession from Detective Pike, who had interviewed her about the ring. *The reason I did not cross-examine her concerning this statement is that, despite the numerous times I had read the affidavit, I simply did not see the statement. I have no explana-*

---

[217] RP at 1919 (emphasis added).

[218] *Id.* at 1440-42, 1448-50 (Ex. 85).

*tion how I could have missed it or its significance but I did.*
After Ms. Rodriguez had finished testifying and I realized my
error, I attempted to bring this statement out in the cross
examination of Detective Davidson but the trial court would
not permit me to do so, sustaining the State's hearsay objection
but ruling that I could recall Ms. Rodriguez. Mr. Alton and I
discussed recalling Ms. Rodriguez to ask her about the rings
but decided against it. She had been very emotional when she
testified for the State and we were concerned she would become
so again. We did not want that to be the last thing the jury saw
and heard before they began deliberations. *I now believe that it
was a mistake not to recall Ms. Rodriguez.*[219]

■■■ Courts generally entrust cross-examination tech-
niques, like other matters of trial strategy, to the profes-
sional discretion of counsel. In assessing Petitioner's claim
that his counsel did not effectively cross-examine a witness,
we need not determine why trial counsel did not cross-
examine if that approach falls within the range of reason-
able representation. "In retrospect we might speculate as to
whether another attorney could have more efficiently at-
tacked the credibility of . . . witnesses . . . . The extent of
cross-examination is something a lawyer must decide
quickly and in the heat of the conflict. This . . . is a matter
of judgment and strategy."[220]

Even assuming defense counsel was deficient in not
cross-examining Ms. Rodriguez concerning her statement
to police authorities, Petitioner cannot establish the reason-
able probability that, but for this probable error, the out-
come of his trial would have been different. In order to
establish prejudice, Petitioner would have to demonstrate
how Ms. Rodriguez' testimony on cross-examination could
have overcome the overwhelming evidence against him.
Besides, the record indicates the jury heard that a wedding
ring belonging to Ms. Couch was in her daughter's posses-
sion.[221]

---

[219] Decl. of Julia Lindstrom at 1-2 (Pet'r's Am. Pers. Restraint Pet., App. at 367-68) (emphasis added).

[220] *State v. Stockman*, 70 Wn.2d 941, 945, 425 P.2d 898 (1967).

[221] RP at 1919.

■ Petitioner's next five claims of ineffective assistance of counsel focus on his counsel's alleged failure to conduct a reasonable investigation. Although there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"[222] and "[j]udicial scrutiny of counsel's performance must be highly deferential,"[223] a defense attorney has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[224] Not conducting a reasonable investigation is especially egregious when a defense attorney fails to consider potentially exculpatory evidence.[225]

Defense counsel must, " 'at a minimum, *conduct a reasonable investigation* enabling [counsel] to make informed decisions about how best to represent [the] client.' "[226] This includes investigating all reasonable lines of defense,[227] especially "the defendant's 'most important defense.' "[228]

---

[222] *Strickland*, 466 U.S. at 689.

[223] *Id.*

[224] *Id.* at 690-91 ("[S]trategic choices made after [a] less than complete investigation are reasonable" if reasonable professional judgment supported the limited investigation.).

[225] *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002); *see also Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) ("A lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrates his client's factual innocence, or that raises sufficient doubt[s] as to that question to undermine confidence in the verdict, renders deficient performance.") (first alteration in original).

[226] *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001) (alterations in original) (quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994)); *see also Kimmelman v. Morrison*, 477 U.S. 365, 385, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986) ("Respondent's lawyer neither investigated, nor made a reasonable decision not to investigate, the State's case through discovery. Such a complete lack of pre-trial preparation puts at risk both the defendant's right to an ' "ample opportunity to meet the case of the prosecution" ' and the reliability of the adversarial testing process.") (quoting *Strickland*, 466 U.S. at 685).

[227] *Morrison*, 477 U.S. at 384 (The adversarial "testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies . . . .").

[228] *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.) (quoting *Sanders*, 21 F.3d at 1457), *amended by* 253 F.3d 1150 (9th Cir. 2001).

Counsel's "failure to consider alternate defenses constitutes deficient performance when the attorney 'neither conduct[s] a reasonable investigation nor ma[kes] a showing of strategic reasons for failing to do so.' "[229] Once counsel reasonably selects a defense, however, "it is not deficient performance to fail to pursue alternative defenses."[230] An attorney's action or inaction must be examined according to what was known and reasonable at the time the attorney made his choices[231] and " 'ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.' "[232]

### FAILURE TO ADEQUATELY INVESTIGATE AND PRESENT A MENTAL ILLNESS DEFENSE IN THE GUILT PHASE

*ISSUE (8). Whether Petitioner was deprived of effective assistance of counsel when his attorneys did not pursue a mental illness defense after consulting five mental health experts after Petitioner's refusal to adopt any defense requiring an admission of guilt.*

Petitioner argues that defense counsel did not adequately investigate and present evidence relating to a mental illness defense, rendering counsel's representation ineffective. According to Petitioner, a reasonable investigation would have uncovered evidence which would have provided a defense to the charged crimes and aggravating circumstances in the *guilt phase*, as well as essential mitigating psychological evidence in the *penalty phase*.

Petitioner's defense team, consisting of chief trial counsel (Mr. Alton), cocounsel (Ms. Lindstrom), and four investigators, conducted an investigation in preparation of a "miti-

---

[229] *Rios*, 299 F.3d at 805 (alterations in original) (quoting *Sanders*, 21 F.3d at 1456).

[230] *Id.* at 807; *see also Bean v. Calderon*, 163 F.3d 1073, 1082 (9th Cir. 1998); *Turk v. White*, 116 F.3d 1264, 1267 (9th Cir. 1997).

[231] *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995).

[232] *Bragg*, 242 F.3d at 1088 (quoting *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986)).

gation report" which was submitted to the prosecutor before the death penalty notice was filed.[233] This report chronicled Petitioner's medical history and the abuse he allegedly suffered. In addition, the report contained a neuropsychological screening evaluation which had been completed in 1994 by Lloyd I. Cripe, Ph.D., a clinical neuropsychologist, as part of another criminal investigation involving Petitioner.[234]

During pretrial investigation, defense counsel retained five mental health experts—two psychiatrists (Dorothy Otnow Lewis, M.D. and Robert B. Olsen, M.D.), a neurologist (Barbara Jessen, M.D.) and two neuropsychologists (Lloyd I. Cripe, Ph.D. and John B. Powell, Ph.D.)—to evaluate Petitioner's mental state. Only Dr. Cripe and Dr. Olsen were retained as qualified experts and both testified during the *penalty phase* of the trial.[235]

On May 29, 1997, Dr. Cripe, a board-certified clinical neuropsychologist since 1985, interviewed Petitioner and administered several tests. He furnished a report to defense counsel, which concluded that "[Petitioner] clearly manifests impairments of neurobehavioral functioning."[236] According to Dr. Cripe, Petitioner's neurobehavioral problems were "probably multi-factorial including: chronic learning disability, closed head injury, drug abuse, chronic medical condition (diabetes), and medication effects."[237] Dr. Cripe was of the opinion that "there are *mitigating factors* in [Petitioner's] case that should be carefully considered in negotiating or in determining the most appropriate sen-

---

[233] State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 346-67.

[234] "[Petitioner] manifests neurobehavioral problems with multiple causation. The causation probably includes congenital & developmental factors, learning disability, an abusive childhood, and a closed head injury." Report of Lloyd I. Cripe, Ph.D. (Nov. 8, 1994) (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 503); *see also* Decl. of Lloyd I. Cripe, Ph.D., at 1-2 (Pet'r's Am. Pers. Restraint Pet., App. at 157-58).

[235] *Davis*, 141 Wn.2d at 875-77.

[236] Report of Lloyd I. Cripe, Ph.D., at 4 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 506).

[237] *Id.*

tence if [Petitioner] is found guilty of the allegations."[238] He also recommended that the results of the "neuropsychological evaluations be combined with medical evaluations by neurologic specialists who understand brain behavior relationships."[239] Dr. Cripe neither requested further background information on Petitioner from defense counsel nor qualified his conclusion because of insufficient information about his patient.

A declaration by Dr. Cripe was submitted as part of this petition. He recalled that defense counsel asked him to "do a quicker evaluation than normal rather than a comprehensive evaluation."[240] He also remembered defense counsel telling him that "other experts were evaluating [Petitioner] for mental illness and that [Dr. Cripe] should evaluate [Petitioner's] neuropsychological functioning and abilities only."[241]

Defense counsel arranged for Barbara Jessen, M.D., a physician board-certified in neurology and EEG (electronencephalogram), to consult with Petitioner. She evaluated Petitioner on July 25, 1997. In her report to counsel, she was unable to identify "objective evidence of any neurological deficits of a gross nature which could be correlated with [Petitioner's] prior episodes of head injury or with [Petitioner's] behavior."[242] She reported that an MRI (magnetic resonance imaging) scan of Petitioner's brain was normal, indicating "no gross structural abnormality of the brain," and that an EEG printout revealed generalized slowing perhaps "due to medications."[243] She also mentioned in her report that "the type of examination which is conducted by a neurologist may not pick up the

---

[238] *Id.*

[239] *Id.*

[240] Decl. of Lloyd I. Cripe, Ph.D., at 2 (Pet'r's Am. Pers. Restraint Pet., App. at 158).

[241] *Id.* at 2-3.

[242] Report of Barbara Jessen, M.D., at 4 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 512).

[243] *Id.* at 3-4.

more subtle abnormalities which are seen on neuropsychological testing."[244]

The third expert retained by defense counsel was Dorothy Otnow Lewis, M.D., a professor of psychiatry at New York University School of Medicine. She is certified by the American Board of Psychiatry and Neurology.[245] On August 3, 1997 she, along with counsel, interviewed Petitioner at the Pierce County Jail. The interview was videotaped.[246] Dr. Lewis also interviewed Petitioner's mother, sister, and his sister's boyfriend. She did not prepare a report.[247] A declaration from Dr. Lewis submitted on behalf of Petitioner provided various conclusions concerning Petitioner's mental state, including that Petitioner "has been psychotic for years prior to the offense in question," Petitioner "is of borderline intelligence," and Petitioner "suffers from severe dissociative symptoms as a result of the extreme physical abuse he endured and . . . that dissociation accounts in great measure for [Petitioner's] amnesia for the offense in question."[248]

Defense counsel retained Robert B. Olsen, M.D., board-certified in internal medicine, psychiatry, and forensic psychiatric and geriatric psychiatry. According to Dr. Olsen, defense counsel requested that he consult with Petitioner "regarding possible effects of diabetes and mental illness on [Petitioner]."[249] As preparation for his inter-

---

[244] Id.

[245] Pet'r's Am. Pers. Restraint Pet., App. at 337.

[246] A verbatim transcript of the interview was submitted by the State. State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 810-1055.

[247] Petitioner submitted a letter (referred to in Dr. Lewis' declaration) from Dr. Lewis to Petitioner's appellate counsel, stating that "I was never asked to provide Mr. Alton with a report or to testify in court. Therefore, although Mr. Alton was informed of my findings and of the need for further interviews and examinations, this letter represents the only formal documentation of my findings." Pet'r's Am. Pers. Restraint Pet., App. at 324.

[248] Decl. of Dr. Dorothy Otnow Lewis at 9 (Pet'r's Am. Pers. Restraint Pet., App. at 323).

[249] Report of Robert B. Olsen, M.D. at 1 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 516).

view with Petitioner, Dr. Olsen reviewed Petitioner's medical records, psychological testing results, neuropsychological and neurological consultations (by Dr. Cripe and Dr. Jessen), and family interview transcripts.[250] On October 17, 1997, Dr. Olsen conducted a three-hour interview of Petitioner.[251] Dr. Olsen did not in his report to defense counsel request further background information on Petitioner, and he did not qualify his conclusion because of insufficient information on Petitioner. He summarized his findings as follows:

> In summary, there is a clearly documented history of compunding [sic] influences on [Petitioner's] behavior.
>
> 1. Uncontrolled diabetes mellitus.
>
> 2. Chronic and acute alcohol intoxication and abuse.
>
> 3. Chronic and acute cocaine intoxication and abuse.
>
> 4. An incompletely described and diagnosed psychiatric illness of potentially psychotic proportions.
>
> 5. A progressive decline in complex mental functioning between 1994 and 1997.[252]

In his declaration submitted as part of this petition, Dr. Olsen stated that:

> Mr. Alton asked me to focus my evaluation of [Petitioner] on the effects of his diabetes, rather than any psychiatric issues. He asked me if I could affirmatively make a diagnosis of Dissociative Identity Disorder. I told him that I could not. I was not asked to explore any potential mental defense to the charge. Mr. Alton never asked me to do more regarding my finding that [Petitioner] had an undiagnosed psychiatric illness. I assumed that Mr. Alton was pursuing the psychiatric issues of [Petitioner] with another expert.
>
> . . . .
>
> I do not recall speaking to Mr. Alton about my testimony prior to testifying. Mr. Alton did send me a list of questions

---

[250] Id.

[251] Id.

[252] Id. at 17 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 532).

which focused largely on diabetes and how it had affected [Petitioner's] life and behavior. . . .[253]

Defense counsel retained John B. Powell, Ph.D., a neuropsychologist. Before evaluating Petitioner, he reviewed the legal and medical records in the case and spoke with Dr. Jessen about the possibility that Petitioner was suffering from a multiple personality disorder.[254] Dr. Powell interviewed Petitioner for 4.5 hours and noted the following in his report to defense counsel:

> Of primary concern in my evaluation were the issues of [Petitioner's] neurological impairment from the head injury in 1981, and the suggestion by Dr. Jessen of a possible multiple personality disorder. However, I also investigated broader neurobehavioral issues, including [Petitioner's] capacity to organize and direct his behavior, his capacity to cope with emotional impulses, his comprehension of the wrongfulness of the alleged crime, and his capacity to participate in his own defense. . . .
>
> . . . .
>
> I saw no evidence of any thought disorder, delusions or hallucinations.
>
> . . . .
>
> Since the issue of multiple personality disorder had been raised previously by Dr. Jessen, I spent some time exploring this with [Petitioner]. [Petitioner] confirmed upon questioning that he "heard voices", which usually offered him advice—they never said negative things to him or gave him commands. When asked about the personalities noted by Dr. Jessen, [Petitioner] claimed that there were four of them, and that these were indeed the sources of the voices in his head. [Petitioner] gave names and detailed descriptions of the four personalities, all of whom appeared quite benign and helpful. By his account, these personalities coexisted openly and did not ever take control of his body. When asked about another personality noted by Dr. Jessen ('The Boss'), [Petitioner] said

---

[253] Decl. of Robert B. Olsen, M.D., at 2 (Pet'r's Am. Pers. Restraint Pet., App. at 423).

[254] Report of John B. Powell, Ph.D. at 1 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 534).

he had "forgotten about that one", and then launched into another detailed description. I had some difficulty distinguishing between the personalities from his descriptions. I then asked about another personality, "Frank". [Petitioner] again provided a detailed description of this sixth individual. *I did not mention to [Petitioner] that I had made up the name "Frank".*

[Petitioner's] account of his "multiple personalities" is extremely atypical from a number of perspectives, and his blatant manufacturing of information on a fictitious personality raises serious questions about the credibility of his other descriptions. . . .

[Petitioner] was very cooperative with testing, *but there were again indications that he was motivated to present himself as being more impaired than he actually was.* On almost all measures he showed a major decline in performance levels from where he was at the time of testing by Dr. Cripe. . . . Such findings are extremely difficult to explain in the absence of a serious neurological illness or accident, and tend to invalidate the results.

 . . . .

In summary, I cannot find any evidence to support multiple personality disorder, thought disorder, or borderline intelligence. The most likely influences on [Petitioner's] behavior are a personality disorder (characterized by long-standing, maladaptive narcissistic and antisocial behaviors), a mild traumatic brain injury (characterized by lowered impulse control and lowered stress tolerance), and the combined effects of alcohol and drug abuse. [Petitioner] is currently mentally competent, understands his criminal charges and the wrongfulness of the behavior of which he is accused, and can participate appropriately in his own defense. Despite my obvious reservations, I cannot conclusively rule out multiple personality disorder (absence of evidence is not evidence of absence), and if Dr. Jessen feels she has stronger evidence, then you may wish to build a defense around her testimony. I fear that juries will not be too sympathetic to my findings.[255]

---

[255] *Id.* at 1-4 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 534-37) (emphasis added).

Defense counsel, Mr. Alton, submitted a declaration describing his efforts in investigating Petitioner's background and a potential mental illness defense, stating:

> During the course of my representation of Cecil Davis, my co-counsel Julia Lindstrom and I utilized the services of four investigators: . . . .
>
> Prior to trial I received and reviewed each of the written memorandums of [the investigators] . . . .
>
> . . . .
>
> Our defense team was able to gather the medical records of [Petitioner] . . . . I provided these medical records to the various doctors who evaluated [Petitioner] at my request prior to trial.
>
> Our defense team was able to secure [Petitioner's] service and medical records from the time that he spent in the Army. I received and reviewed these documents prior to trial and relied upon them in part when making decisions about what evidence to present at the special sentencing proceeding. I determined not to present evidence that delved too deeply into [Petitioner's] behavior while in the Army because the records we received reflected that [Petitioner] had had problems with his anger in the Army, and he had been discharged following a drunk driving accident that resulted in injuries to a female passenger. . . .
>
> Prior to trial I arranged to have [Petitioner] examined and evaluated by five different doctors: Dr. Lloyd Cripe, Dr. Dorothy Otnow Lewis, Dr. Barbara Jessen, Dr. John Powell, and Dr. Robert Olsen. It was my hope that a psychologist, psychiatrist, or medical doctor would be able to diagnose [Petitioner] with a mental illness or brain abnormality that could be used to either negate guilt or provide the jury with mitigating circumstances.
>
> Prior to trial I received and reviewed the reports of Drs. Cripe, Lewis, Jessen, Powell, and Olsen, which follow or are attached to this declaration. I relied in part on these reports in making decisions about the defense that should be presented at trial; and in making decisions as to what mitigation evidence would be presented at the special sentencing proceeding.
>
> I was present for Dr. Lewis' videotaped interview of [Petitioner] at the Pierce County Jail. I remember that Dr. Lewis suggested to me the possibility of a mental defense based upon

"multiple personality disorder." I was initially optimistic about pursuing this defense, *but was somewhat skeptical about the actual evidence that could be presented to support such a diagnosis.*

I therefore determined to have [Petitioner] evaluated by a second doctor, Dr. Powell, before making a decision with [Petitioner] about presenting a defense based upon multiple personality disorder. Dr. Powell examined and interviewed my client. I consulted with Dr. Powell and reviewed his report, . . . . Dr. Powell would not diagnose [Petitioner] with multiple personality disorder, and he in fact suggested that my client was faking a personality disorder. Dr. Powell reported that he had suggested a fictitious personality named "Frank" to [Petitioner], and [Petitioner] proceeded to describe this personality to Dr. Powell. *I ultimately decided not to pursue a defense based upon "multiple personality disorder" due to concerns about credible evidence to support such a diagnosis, as well as my client's wishes as discussed below.*

*I also determined not to pursue a mental defense because [Petitioner] insisted that he was innocent and he instructed us not to pursue any defense that required an admission that he killed Mrs. Couch.*

Myself, Ms. Lindstrom, and some of our investigators interviewed or attempted to interview a number of [Petitioner's] family members. . . . *Most of [Petitioner's] family members were either disinterested in providing assistance, had little helpful information to offer, or were downright hostile towards [Petitioner].*

. . . .

*I do not recall that any of the five doctors I consulted with could diagnose my client with a mental illness or brain damage.*

. . . .

I did not call Dr. Lewis for purposes of presenting a defense based upon multiple personality disorder after I received Dr. Powell's report. Dr. Powell's report was not dispositive of my decision, but I was confident that given Dr. Powell's conclusions, *the State would be able to call doctors who would concur with Powell and dispute Lewis. Most importantly, [Petitioner] was adamant that he did not kill Mrs. Couch and he did not*

*want us to either admit that he killed Mrs. Couch or present a mental defense. . . .*[256]

Petitioner cannot fairly claim his counsel did not perform *any* investigation into the possibility of a mental defense. He argues only that his trial counsel should have investigated a mental illness defense more thoroughly.

 Under existing Washington and federal case law, defense counsel's investigation into Petitioner's medical and mental health and his reliance on the conclusion of his expert adequately answers Petitioner's ineffective assistance of counsel claim.[257] In this state, "[w]hen defense counsel knows or has reason to know of a capital defendant's medical and mental problems that are relevant to making an informed defense theory, defense counsel has a duty to conduct a reasonable investigation into the defendant's medical and mental health, have such problems fully assessed and, if necessary, retain qualified experts to testify accordingly."[258]

 In *Brett*, we determined counsel was ineffective when he did not promptly seek appointment of cocounsel, present a mitigation report to the prosecutor before a death penalty notice was filed, investigate relevant mental health issues, timely seek appointment of qualified mental health experts, and adequately prepare for the *penalty phase* by retaining qualified mental health experts.[259] We noted that while failure to perform any one of these actions would not establish ineffective assistance of counsel, counsel's numerous failures fell below the "objective standard of reasonableness" required of counsel.[260]

---

[256] Decl. of Lloyde Alton at 7 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 276) (emphasis added).

[257] *See Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995).

[258] *In re Pers. Restraint of Brett*, 142 Wn.2d 868, 880, 16 P.3d 601 (2001).

[259] *Id.* at 882.

[260] *Id.* at 882-83 (citation omitted); *see also Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002) (Defense "attorneys have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices.*").

In this case defense counsel's actions well conformed to the objective standard of reasonableness under prevailing professional norms. The defense team conducted an in-depth investigation in preparation of a mitigation report for Petitioner. Counsel retained five mental health experts and conducted a thorough pretrial investigation into the possibility that a mental illness defense could be used at trial. Counsel readily admits he had hoped "a psychologist, psychiatrist, or medical doctor would be able to diagnose [Petitioner] with a mental illness or brain abnormality that could be used to either negate guilt or provide the jury with mitigating circumstances."[261]

Initially, Dr. Olsen, one of the defense experts, found that Petitioner suffered from "an incompletely described and diagnosed psychiatric illness of potentially psychotic proportions."[262] However, in his declaration, Dr. Olsen admitted that when defense counsel asked him if he could "affirmatively make a diagnosis of Dissociative Identity Disorder," he could not.[263]

Only one other expert, Dr. Lewis, expressed the possibility that Petitioner suffered from multiple personality disorder. But after personally observing Dr. Lewis' interview of Petitioner, counsel became "skeptical about the actual evidence that could be presented to support a [multiple personality disorder] diagnosis."[264] Trial counsel had Petitioner evaluated by Dr. Powell "before making a decision with [Petitioner] about presenting a defense based on multiple personality disorder."[265] Dr. Powell thought Petitioner "was motivated to present himself as being more impaired than he actually was" and found no "evidence to support multiple personality disorder, thought disorder, or

[261] Decl. of Lloyde Alton at 4 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 273).

[262] Report of Robert B. Olsen, M.D., at 17 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 532).

[263] Decl. of Robert B. Olsen, M.D., at 2 (Pet'r's Am. Pers. Restraint Pet., App. at 423).

[264] Decl. of Lloyde Alton at 4 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 532).

[265] *Id.* at 4-5 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 273-74).

borderline intelligence."[266] Dr. Powell dismissed the possibility that Petitioner was insane or suffered from diminished capacity.[267]

Considering Dr. Powell's conclusion and Petitioner's own refusal to adopt any defense that would require him to admit killing Ms. Couch, defense counsel made a reasonable, informed strategic choice to forgo a mental illness defense in the *guilt phase* of the trial.[268]

It was clearly within the " 'wide range of professionally competent assistance' " for defense counsel "to rely on properly selected experts."[269] Petitioner has not alleged any facts showing that his counsel should not have chosen the mental health experts who assisted the defense, that counsel had any reason to believe the experts were incompetent, or that credentials of the experts were deficient in any manner.[270] Petitioner has also not submitted any credible evidence that the conclusions of the experts were "tentative, snap judgments, or otherwise based on anything less than a full analysis of complete data."[271]

---

[266] Report of John B. Powell, Ph.D. at 4 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. 537).

[267] *Hendricks*, 70 F.3d at 1038 ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense.").

[268] *See, e.g., Hendricks*, 70 F.3d at 1038 (where nearly 20 hours of mental health evaluation by defense experts revealed no basis for a mental defense, defense counsel was justified in the decision not to conduct further investigation into the matter); *Morgan v. Bunnell*, 24 F.3d 49, 52 (9th Cir. 1994) (attorney was justified in not pursuing a mental defense where two experts concluded the defendant was sane and a third expert could not reach a conclusion); *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) (even where there is a strong basis for a mental defense, an attorney may forgo that defense where the attorney's experts would be subject to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion).

[269] *Harris*, 949 F.2d at 1525 (quoting *Strickland v. Washington*, 466 U.S. 668, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

[270] *Id.*

[271] *Hendricks*, 70 F.3d at 1037; *see, e.g., Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) ("Counsel's failure to consult with . . . experts whom appellate counsel names in his brief was not unreasonable . . . because counsel did retain medical experts whom he thought [were] well-qualified.").

*FAILURE TO PRESENT ADEQUATE PSYCHOLOGICAL EVIDENCE DURING PENALTY PHASE*

*ISSUE (9). Whether Petitioner's right to counsel under the sixth and fourteenth amendments to the United States Constitution was violated when his counsel presented psychological evidence during the penalty phase of the trial.*

 Petitioner's argument that his counsel was ineffective in not submitting adequate psychological evidence during the *penalty phase* of his trial is not supported by the record.

The main focus of Petitioner's mitigating evidence was given in testimony by two experts, Lloyd I. Cripe, Ph.D. and Robert B. Olsen, M.D.[272] Dr. Cripe, a specialist in clinical neuropsychology, testified that Petitioner was of low intelligence, had a learning disability, and suffered from substance abuse, diabetes, and a "closed head injury." He testified that he diagnosed Petitioner as being generally "neurologically impaired" from 1994 through 1997 as a result of one or a combination of those conditions.[273] Dr. Olsen, a specialist in internal medicine and psychiatry, testified concerning Petitioner's "history of diabetes, chronic alcohol and cocaine abuse and a progressive decline of complex mental functioning between 1994 and 1997."[274] He also expressed the opinion that Petitioner "suffered from certain anti-social, borderline and schizotypal personality disorders, but because his brain scan (MRI) and brain wave (EEG) tests were normal, [Petitioner] does not have altered structure in his brain."[275]

*FAILURE TO CONDUCT AN ADEQUATE BACKGROUND INVESTIGATION AND PRESENT ADEQUATE MITIGATING EVIDENCE IN THE PENALTY PHASE*

*ISSUE (10). Whether Petitioner was deprived of effective assistance of counsel when his trial counsel conducted a*

---

[272] *State v. Davis*, 141 Wn.2d 798, 876-77, 10 P.3d 977 (2000).

[273] *Id.* at 877.

[274] *Id.*

[275] *Id.*

*background investigation and presented mitigating evidence in the penalty phase of the trial.*

Petitioner's claim that his attorneys were ineffective by not adequately investigating and gathering, and consequently not presenting, adequate mitigating evidence during the *penalty phase* is without merit.

 Under the Sixth Amendment, counsel is required to conduct a *reasonable* investigation. Petitioner's counsel fulfilled this requirement. As a result of trial counsel's exhaustive pretrial investigations, substantial mitigating evidence was presented during the *penalty phase* of Petitioner's trial, including evidence of Petitioner's troubled childhood, family problems, substance abuse, capacity to serve his jail term errant-free, and psychological makeup.[276]

Even assuming defense counsel's background investigation may have been deficient, Petitioner cannot demonstrate he was prejudiced during the *penalty phase* of his trial because of it. Considering the evidence which established the aggravating circumstances, it is unlikely any additional information about Petitioner's background would have made a difference.[277]

### Failure to Investigate State Witnesses

*Issue (11). Whether Petitioner was prejudiced by defense counsel's decision not to interview before trial a jailhouse*

---

[276] Defense counsel retained four investigators to obtain Petitioner's military and medical records, as well as to investigate and interview Petitioner and his acquaintances and family members. Decl. of Lloyde Alton at 3 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 272); *see also* Pet'r's Military Records (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 538); Pierce County Det. & Corr. Ctr. Health Facility (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 284-345); Univ. of Kan. Med. Ctr. (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 396-404); Mitigation Packet (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 346-63); Interviews (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 414-500).

[277] *See Pizzuto v. Arave*, 280 F.3d 949, 969 (9th Cir. 2002) ("No doubt counsel could have done more; more is always possible. But we cannot see any reasonable probability that more in this case would have led to a different sentence.").

*informant who testified Petitioner admitted killing Ms. Couch.*

Petitioner claims ineffective assistance of counsel because before trial his attorneys neither investigated nor interviewed any State's witnesses other than members of Petitioner's family. He also argues his counsel was ineffective because they failed to adequately investigate Shelbey B. Johnson, a "jailhouse informant" who testified against him. Petitioner asserts that if his counsel had conducted a reasonable investigation, they could have cross-examined Mr. Johnson more adequately during trial, impeached him with testimony from another witness, Timothy Hicks, and uncovered evidence that Mr. Johnson was biased.

Before trial, Petitioner and Mr. Johnson were cellmates in the Pierce County Jail. Mr. Johnson testified at trial that while he and Petitioner were incarcerated, Petitioner admitted killing Ms. Couch but denied raping her.[278] In our opinion on Petitioner's direct appeal, we observed that during trial "[a] substantial criminal history of dishonesty was introduced against Mr. Johnson." Under direct examination by the State, Mr. Johnson admitted he was currently serving a 10-year sentence in Montana for "felony theft and bail jumping"[279] and that he had prior convictions for theft, robbery, possession of stolen property, possession of a controlled substance, and taking a motor vehicle without permission.[280] Mr. Johnson also admitted he had been previously charged with giving a false name to police.[281] We also observed that "[d]efense counsel attacked [Mr.

---

[278] According to Mr. Johnson, Petitioner approached him and demanded to read his newspaper, stating that "the newspaper's saying that [Petitioner] raped the old bitch, . . . that I may have killed her, but I didn't rape her." Mr. Johnson relayed this conversation in a letter to the jail staff and provided police officers with a taped statement.

[279] RP at 1995.

[280] *Id.* at 1996.

[281] *Id.* at 1997.

Johnson's] credibility, suggesting he lied because [Petitioner] was bothering him."[282]

In her declaration, Ms. Lindstrom states that:

> Other than members of Mr. Davis' family who were to testify I do not recall that I *interviewed* any of the State's witnesses in the guilt phase prior to trial.
>
> . . . .
>
> To the best of recollection, my preparation prior to trial for the cross examination of Shelby Johnson consisted of reviewing his record and discussing his testimony with Mr. Davis. We *did not interview Mr. Johnson prior to his testimony*. I believe that he was no longer in the Pierce County Jail and possibly had been moved to a Department of Corrections facility. I believe this is the reason I did not interview him in advance of the trial although I do believe *we may have interviewed him just prior to his testimony*.[283]

Petitioner provided a declaration from Timothy Lee Hicks disputing that Petitioner admitted to Mr. Johnson that he killed Ms. Couch. His declaration noted that:

> On one occasion, Johnson came into the cell and said he knew how I could beat my charges. . . . He then laid out a scheme in which I should falsely state that the black male [Petitioner] confessed to the murder to me . . . . He said that if I did this, it would be as if I had a "get out of jail ticket".
>
> . . . .
>
> Penny Cole has showed me a copy of a letter . . . in which Johnson claims that he overheard the [Petitioner] confessing to the murder of the old lady. I recall that one day the [Petitioner] came down from his cell and wanted to read the newspaper. Johnson had the newspaper in his possession and was telling the [Petitioner] that he had to wait. The [Petitioner] kept asking Johnson if the paper was saying what the news said, that he had raped and killed the old lady. I recall the [Petitioner] saying that this was "bullshit" or "horseshit". He said that if the paper said this about him, he was going to sue the paper. The [Petitioner] got agitated when Johnson refused to

---

[282] *Davis*, 141 Wn.2d at 865.

[283] Decl. of Julia Lindstrom at 3-4 (Pet'r's Am. Pers. Restraint Pet., App. at 369-70) (emphasis added).

let him look at the paper. At no time was there a conversation in which he said that he had "killed the bitch". At no time did he say that he raped or killed the old lady.

The cells in the high security area are arranged in such a way that you can hear what is being said in the common area. If the [Petitioner] confessed to the murder, I would have heard it. I recall that his case was a high profile case with a lot of publicity, and if I heard him confess, I would have remembered it.[284]

Petitioner also encloses a letter from the prosecuting attorney, John M. Neeb, to the Montana Board of Pardons and Paroles on behalf of Mr. Johnson. In that letter, dated March 12, 1998, after Petitioner's trial, Mr. Neeb wrote that:

Cecil Davis made several statements to Shelby incriminating himself in the murder. Shelby wrote a letter to jail staff in an attempt to get moved away from Cecil Davis. That letter was forwarded to the detective investigating the murder case, and he obtained a taped statement from Shelby. Shelby was cooperative in giving that statement and continued to cooperate up to and including giving testimony at trial. That testimony was helpful to the people of the State of Washington. . . .

*Shelby never requested any special treatment in exchange for his cooperation.* He received a sentence in the middle of the applicable range for his crimes in Pierce County. He never tried to back away from what he said to the detective or prevent himself from being transported back to Washington to testify.

After his testimony was complete, Shelby asked that I mention his cooperation to the appropriate authorities in Montana. I was very clear with Shelby that I had no control over his release from the prison system in Montana. . . .

Shelby did the right thing in this case. Anyone involved in the criminal justice system knows the frustration of having a witness recant or refuse to testify. That is especially likely to happen when the witness is incarcerated himself and wants to avoid wearing a "snitch jacket". Shelby neither recanted or refused to cooperate. He followed through and was a portion of

---

[284] Decl. of Timothy Lee Hicks at 2-3 (Pet'r's Am. Pers. Restraint Pet., App. at 184-85).

the evidence that resulted in a very dangerous killer being placed on death row.

Please give this information whatever consideration you deem appropriate when Shelby is reviewed for release on parole. . . .[285]

■ The duty to investigate "does not necessarily require that every conceivable witness be interviewed."[286] However, defense counsel has an obligation to " 'provide factual support for [the] defense where such corroboration is available.' "[287] Not pursuing such corroborating evidence with an adequate pretrial investigation may, under certain circumstances, establish constitutionally deficient performance.[288]

At the least, a defendant seeking relief under a "failure to investigate" theory must show a reasonable likelihood that the investigation would have produced useful information not already known to defendant's trial counsel.[289] And even if a defendant can show that exculpatory evidence unknown to trial counsel would have been uncovered by further investigation or interview, the court must still consider whether counsel's deficient performance prejudiced the defendant. In evaluating prejudice, " 'ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case.' "[290]

Petitioner does not identify any witnesses other than Shelbey B. Johnson whom his counsel should have inter-

---

[285] Pet'r's Am. Pers. Restraint Pet., App. at 313-14 (emphasis added).

[286] *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir.), *amended by* 253 F.3d 1150 (9th Cir. 2001).

[287] *Hendricks*, 70 F.3d at 1040 (quoting *United States v. Tucker*, 716 F.2d 576, 594 (9th Cir. 1983)).

[288] *Id.; see also Baumann v. United States*, 692 F.2d 565, 580 (9th Cir. 1982) ("We have clearly held that defense counsel's failure to interview witnesses that the prosecution intends to call during trial may constitute ineffective assistance of counsel.").

[289] *Bragg*, 242 F.3d at 1088 ("When the record clearly shows that the lawyer was well-informed, and the defendant fails to state what additional information would be gained by the discovery she or he now claims was necessary, an ineffective assistance claim fails.").

[290] *Rios v. Rocha*, 299 F.3d 796, 808-09 (9th Cir. 2002) (quoting *Eggleston v. United States*, 798 F.2d 374, 376 (1986)).

viewed. Nor does he indicate their availability or specify the content of their testimony. He has not established that his defense team did not interview Mr. Johnson before he testified at trial. Although Ms. Lindstrom's declaration is contradictory, she claims she "may have interviewed [Mr. Johnson] just prior to his testimony."[291] Petitioner has not provided any evidence to the contrary.

Even if Ms. Lindstrom did not interview Mr. Johnson before he testified, Petitioner has not made a persuasive showing that shortcomings in his counsel's investigation were unreasonable under prevailing professional standards. Ms. Lindstrom stated that she reviewed Mr. Johnson's criminal record and discussed his expected testimony with Petitioner. Petitioner does not contend that he told his counsel that Timothy Lee Hicks was present during his conversation with Mr. Johnson. Petitioner's claim that the existence of Mr. Hicks would have surfaced in an interview with Mr. Johnson is purely speculative.

In addition to showing that Ms. Lindstrom's investigation efforts were deficient, to succeed with his ineffective assistance of counsel claim Petitioner must make a sufficient showing of prejudice. Even assuming Petitioner could demonstrate a reasonable likelihood that an interview with Mr. Johnson would have led to identification of Mr. Hicks, Petitioner cannot show that he was prejudiced by his counsel's performance. Despite Petitioner's suggestion to the contrary, defense counsel did effectively cross-examine and impeach Mr. Johnson.[292]

Petitioner argues that through a reasonable investigation his counsel could have discovered Mr. Johnson was seeking a benefit from the prosecutor in exchange for his trial testimony. He provides no evidence that the prosecutor agreed to assist Mr. Johnson with any of his future legal problems. The prosecutor's letter to the Montana Parole Board on Mr. Johnson's behalf was written after Petition-

---

[291] Decl. of Julia Lindstrom at 3 (Pet'r's Am. Pers. Restraint Pet., App. 369).

[292] RP at 2004-06.

er's trial and explicitly states that Mr. Johnson never requested any special treatment in exchange for his cooperation and testimony in this case.

The State's case against Petitioner was strong. The evidence against him was overwhelming. Any prejudice arising out of shortcomings in investigation of witnesses does not undermine the verdict of the jury.

*FAILURE TO INVESTIGATE PHYSICAL EVIDENCE*

*ISSUE (12). Whether Petitioner received ineffective representation when his counsel did not retain an expert to observe the scientific testing of blood evidence discovered on Petitioner's shoe and did not present expert testimony at trial concerning the DNA analysis of that blood evidence.*

Petitioner claims defense counsel was ineffective for not retaining an expert to observe the scientific testing of physical evidence and by not presenting expert testimony at trial to contradict the State's expert witness.

Human hairs recovered from the crime scene and bloodstains found on Petitioner's left tennis shoe were sent to GeneLex Laboratory for DNA (deoxyribonucleic acid) testing. GeneLex determined that, with respect to the hair sample, "[t]he DNA typing results were inconclusive due to poor amplification of the sample."[293] In a test involving the bloodstain, the laboratory concluded the blood found on the shoe was not Petitioner's but was consistent with Ms. Couch's DNA and that 1 in 625 persons of Asian/Japanese descent would share this DNA type.[294]

Defense counsel retained Donald E. Riley, Ph.D., an expert in DNA analysis, to observe only the testing of the hair samples. He submitted a written report to counsel in which he noted no problems with the DNA testing and did not disagree with the conclusion by GeneLex that the DNA

---

[293] GeneLex Additional Forensic Laboratory DNA Analysis Report (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 1339).

[294] *Id.* at 1327-38; *see also Davis*, 141 Wn.2d at 817.

extracted from the hair sample was inconclusive.[295] Dr. Riley stated in his declaration that he had questions concerning the accuracy of the hair testing process but that he "was ultimately unable to properly and fully convey this to defense counsel."[296] Defense counsel, Mr. Alton, stated in his declaration that he did not call Dr. Riley as a witness because he could not "dispute any of the State's DNA evidence."[297]

▇▇▇ Generally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics.[298] This presumption of counsel's competence can be overcome, however, by showing counsel failed to conduct appropriate investigations to determine what defenses were available, adequately prepare for trial, or subpoena necessary witnesses.[299]

Even assuming it was an unreasonable strategic decision for counsel not to retain Dr. Riley to observe DNA testing of the blood and not to call him as an expert witness at trial, Petitioner cannot establish that those decisions prejudiced his defense or otherwise rendered the outcome of his trial unreliable. He does not show how the testimony of Dr. Riley would have affected the outcome of the trial. Dr. Riley did not disagree with GeneLex that the DNA analysis of hair

---

[295] Report of Donald E. Riley, Ph.D. (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 1137-41).

[296] Decl. of Donald E. Riley, Ph.D. at 3-4 (Pet'r's Am. Pers. Restraint Pet., App. 384-85).

[297] Decl. of Lloyde Alton at 7 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 276).

[298] *State v. Byrd*, 30 Wn. App. 794, 799, 638 P.2d 601 (1981); *see also Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) ("[W]hile the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense."); *Sanders v. Trickey*, 875 F.2d 205, 212 (8th Cir. 1989) (The decision to call a witness is "precisely the sort of strategic trial decision that *Strickland* protects from second-guessing."); *United States v. Garguilo*, 324 F.2d 795, 797 (2d Cir. 1963) ("[T]he advisability of calling particular witnesses . . . [is a matter] open to honest differences of opinion.").

[299] *Byrd*, 30 Wn. App. at 799.

found at the crime scene was inconclusive. Dr. Riley could not testify that the blood found on Petitioner's shoe belonged to any specific person. He also could not provide any significant new facts or evidence that might have led the jury to a different conclusion.[300]

### FAILURE TO ARTICULATE A THEORY OF DEFENSE

ISSUE (13). *Whether Petitioner's right to counsel under the sixth and fourteenth Amendments to the United States Constitution was violated when the alternative theories of defense advanced by his attorneys were that "reasonable doubt" existed as to whether Petitioner was guilty of premeditated murder or that Petitioner was guilty only of first degree felony murder.*

Petitioner claims his attorneys did not develop a coherent theory of defense and that, even if they did, it was inadequately advanced before the jury.

During her closing argument to the jury, Ms. Lindstrom stated:

> If, after you have weighed all of that evidence, you decide that you are convinced beyond a reasonable doubt that Mr. Davis is the person that did it, that he's guilty of going into the Couch's house and some way responsible for her death, then you have to decide what level of culpability he has, and you have three options in this case. You have the option of the premeditated aggravated murder. And you have the option of the second degree murder.
>
> . . . .
>
> There are several degrees and different punishments that are imposed, depending on how the crime is committed. The main difference between the two, the premeditated murder

---

[300] Petitioner also argues that he received ineffective assistance of counsel because his counsel did not cross-examine the State's witness who provided expert testimony that Petitioner's latent fingerprint was on an empty beer carton found in a garbage bag which also contained an empty cigarette carton with a fingerprint matching the victim's left thumb. Petitioner has not cited any law or new facts to overcome the strong presumption that counsel's decision not to emphasize the State's finding concerning the latent fingerprints was the result of sound trial strategy.

with aggravating circumstances, and the felony murder . . . is that the felony—excuse me, the premeditated murder was deliberate and the felony murder, all that's required is a showing that in the process of committing one of these felonies Mrs. Couch died. What you have to decide was did Mr. Davis premeditatedly—did he premeditate, did he intentionally cause the death of Mrs. Couch?[301]

Both defense attorneys acknowledged in their declarations that Petitioner maintained his innocence and that he instructed them not to pursue any defense requiring an admission he killed Ms. Couch. In his declaration, Mr. Alton also stated he "knew that the State's case was very strong, but it was [his] intent to contest the defendant's guilt and [he] tried to do so."[302]

▮▮▮ In order to make the adversarial process meaningful, defense counsel has a duty to investigate all reasonable lines of defense.[303] Even if no viable defense theory is available, the Sixth Amendment still requires counsel to "hold the prosecution to its heavy burden of proof beyond a reasonable doubt."[304]

Petitioner argues that "defense counsel could reasonably have argued . . . there was *reasonable doubt* as to whether Petitioner was guilty of premeditated murder and that he was guilty only of the alternative crime of first-degree felony murder."[305] Counsel advanced two plausible alternative theories of defense. The first was that "reasonable

[301] RP at 2253-54.

[302] Decl. of Lloyde Alton at 7 (State's Resp. to Pet'r's Am. Pers. Restraint Pet., App. at 276).

[303] *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986).

[304] *United States v. Cronic*, 466 U.S. 648, 656 n.19, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) ("Of course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade. At the same time, even when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond a reasonable doubt. And, of course, even when there is a bona fide defense, counsel may still advise his client to plead guilty if that advice falls within the range of reasonable competence under the circumstances.") (citation omitted).

[305] Pet'r's Am. Pers. Restraint Pet. at 47.

doubt" existed. Considering the strength of the State's case, counsel focused on casting doubt in the mind of the jurors concerning Petitioner's guilt. Defense counsel conducted the trial in a manner consistent with this theory of defense and its presentation did not result in constitutional error.[306]

The alternative theory of defense was that if the jury believed Petitioner was guilty, the killing was not premeditated, but instead occurred during commission of a felony. Some evidence on the felony murder defense theory was presented to the jury. Defense counsel requested and was given a jury instruction concerning first degree felony murder.[307]

Generally, choosing a particular defense is a strategic decision "for which there is no correct answer, but only second guesses."[308] Defense counsel made the best tactical choices available to them under the extraordinary circumstances with which they were faced—a brutal murder and no plausible defense. The State's evidence connecting Petitioner to the killing of Ms. Couch was overwhelming. There were few, if any, weaknesses in the evidence that counsel could capitalize upon.

*FAILURE TO OBJECT TO IMPROPER INTRODUCTION OF PREJUDICIAL FACTS DURING PENALTY PHASE*

*ISSUE (14). Whether defense counsel was ineffective by not objecting to admission of certified copies of judgments and sentences, verdict forms, and municipal court dockets to establish Petitioner's prior criminal history.*

---

[306] *Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995) ("In many cases, the law and facts will be so overwhelmingly in favor of the government that defense counsel can do little more than try to poke holes in the government's case in cross-examination. The hopelessness of some cases may even relegate the most competent defense counsel to the role of official hand-holder. The Sixth Amendment does not hold an attorney responsible for the difficulty of the case he inherits. The choice to pursue a bad strategy makes no comment on an attorney's judgment where no better choice exists.").

[307] Jury Instruction 20; CP at 868-69.

[308] *Hendricks*, 70 F.3d at 1041.

Petitioner claims his defense counsel was ineffective during the *penalty phase* of his trial because counsel did not object to facts concerning Petitioner's prior criminal history. He also claims he was denied effective assistance by appellate counsel because the trial exhibits offered during the *penalty phase* were not designated as part of the record on appeal and no issue was raised concerning admissibility of the exhibits.

In the *penalty phase* of Petitioner's case, the State introduced evidence of Petitioner's nine prior convictions. These included second degree robbery, second degree perjury, second and fourth degree assault, first degree criminal trespass, driving without a valid operator's license on two separate occasions, third degree theft, and violation of a domestic violence pretrial no-contact order. Defense counsel did not object to admission of the certified copies of judgments and sentences, and in some cases certified copies of the corresponding jury verdict forms. Petitioner now argues that the information went beyond the scope of what was admissible and unfairly prejudiced him.

Petitioner argues that his trial counsel was ineffective by not objecting to (1) a certified copy of a judgment and sentence documenting Petitioner's robbery conviction, including the fact that he received an exceptional sentence because "the force used by the defendant was beyond and in excess of the force necessary to establish the elements of Second Degree Robbery,"[309] (2) certified copies of verdict forms which reflect that Petitioner had been convicted of lesser offenses than the actual charged offenses,[310] and (3) certified copies of the Tacoma Municipal Court docket indicating Petitioner's misdemeanor convictions and outstanding traffic fines.[311]

---

[309] Pet'r's Am. Pers. Restraint Pet., App. at 6-14; *see also* CP at 2382 (Trial Ex. 193).

[310] Pet'r's Am. Pers. Restraint Pet., App. at 24; *see also* CP at 2382 (Trial Ex. 196).

[311] Pet'r's Am. Pers. Restraint Pet., App. at 34, 41, 43; *see also* CP at 2383-84 (Trial Exs. 197, 199, 200).

 During the *penalty phase* of a capital murder proceeding, RCW 10.95.060(3) requires a trial court to admit "any relevant evidence" having probative value, "including . . . evidence of the defendant's *previous criminal activity*"[312] and RCW 10.95.070(1) requires a jury to consider "any relevant factors" in deciding whether leniency is merited, "including but not limited to . . . [w]hether the defendant has or does not have a significant history, either as a juvenile or an adult, of *prior criminal activity*. . . ."[313]

This broad language, however, is subject to constitutional limitations.[314] Hence, "the statutory mandates under RCW 10.95.060(3) to admit 'any relevant evidence' during the special sentencing proceeding, and under RCW 10.95.070 for the jury to consider 'any relevant factors' " applies to mitigating factors only.[315] The court's admission and the jury's consideration of aggravating factors, though, " 'must be restricted to meet the evidentiary, and state and federal constitutional standards we have articulated. Specifically, evidence of nonstatutory aggravating factors must be limited to defendant's *criminal record*, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant.' "[316]

 "Criminal record" means only the defendant's "record of convictions."[317] "To establish a defendant's criminal history, 'adjudications of guilt' may be admitted, while 'mere allegations or charges not resulting in convictions' are inadmissible."[318] "The dispositive inquiry is whether the

---

[312] RCW 10.95.060(3) (emphasis added).

[313] RCW 10.95.070(1) (emphasis added); *see also State v. Roberts*, 142 Wn.2d 471, 527, 14 P.3d 713 (2000).

[314] *Roberts*, 142 Wn.2d at 527.

[315] *State v. Pirtle*, 127 Wn.2d 628, 666, 904 P.2d 245 (1995).

[316] *State v. Clark*, 143 Wn.2d 731, 780, 24 P.3d 1006 (2001) (emphasis added) (quoting *State v. Bartholomew*, 101 Wn.2d 631, 642, 683 P.2d 1079 (1984)).

[317] *Id.*

[318] *Roberts*, 142 Wn.2d at 527-28 (quoting *Pirtle*, 127 Wn.2d at 668-69).

prior adjudication is 'sufficiently reliable to warrant admission.' "[319]

In *State v. Gentry*,[320] we approved admission of a certified copy of a prior conviction and sentence, even though the sentence and judgment indicated the defendant had received an exceptional sentence. The defendant in that case argued he was prejudiced because the jury was informed that he was sentenced to a longer sentence than statutorily required for his prior conviction. In rejecting this argument, we noted that "[e]vidence is not excluded because it is 'prejudicial' but because it is *unfairly* prejudicial."[321] The fact that the judgment and sentence for a prior offense indicated an exceptional sentence did not render admission of the judgment and sentence unfairly prejudicial and thus inadmissible as an aggravating factor during the *penalty phase* of a capital murder proceeding. We concluded that "[a] certified copy of a judgment and sentence is highly reliable and the imposition of a prior exceptional sentence is relevant to the penalty phase issue."[322]

In *Pirtle* we allowed, as evidence of a prior conviction for felony assault, admission of a certified copy of the information which alleged the assault was "accomplished by use of 'a weapon, namely, a glass, by hitting [the victim] in the face with the glass causing severe lacerations to his face.' "[323] Admission of additional facts in the information did not cause the defendant undue prejudice.

Petitioner has not demonstrated that his defense counsel's decision not to object to admitted evidence concerning Petitioner's prior convictions fell below an objective standard of reasonableness because he cannot show that any objection would have been granted by the trial court.

■■■■■ Imposition of an exceptional sentence in Petitioner's robbery conviction is relevant and admissible dur-

---

[319] *Id.* at 528 (quoting *Pirtle*, 127 Wn.2d at 669).

[320] 125 Wn.2d 570, 888 P.2d 1105 (1995).

[321] *Id.* at 637.

[322] *Id.*; *see also Clark*, 143 Wn.2d at 781.

[323] *State v. Pirtle*, 127 Wn.2d 628, 670, 904 P.2d 245 (1995).

ing the *penalty phase* of the trial.[324] The facts stated in the judgment and sentence apprised the jury that Petitioner received an exceptional sentence only for using excessive force during commission of a prior robbery. A certified copy of a jury verdict form is an acceptable method for proving a prior conviction.[325] Certified copies of municipal court docket entries were admissible to prove Petitioner's prior criminal convictions for driving without a valid operator's license.[326]

Trial counsel's decision not to object to admission of certified copies of a judgment and sentence, verdict forms, and municipal court docket entries did not fall below an objective standard of reasonableness under prevailing professional norms.

### FAILURE TO INFORM THE TRIAL COURT OF A CONFLICT OF INTEREST

*ISSUE (15). Whether there was an actual conflict of interest between Petitioner and his attorneys which adversely affected counsel's performance in violation of the sixth and fourteenth amendments to the United States Constitution.*

Petitioner claims defense counsel assigned to him by the Pierce County Department of Assigned Counsel (DAC) was ineffective because there was an actual conflict of interest between counsel and the State's witness, Shelbey B. Johnson. We rejected in Petitioner's direct appeal a similar argument that the trial court erred in not inquiring into a potential conflict of interest arising out of possible prior representation of Mr. Johnson by the DAC. We found "[t]here is nothing in the record to establish that the DAC represented the State's witness, Shelbey B. Johnson, in the past" and that "[t]here is merely a reference to possible past DAC representation of a potential State witness."[327]

---

[324] *See Gentry*, 125 Wn.2d at 637.

[325] *See State v. Manussier*, 129 Wn.2d 652, 661-62, 921 P.2d 473 (1996).

[326] CrRLJ 7.2(d).

[327] *State v. Davis*, 141 Wn.2d 798, 864, 10 P.3d 977 (2000).

■ We have already concluded that Petitioner could not establish that any alleged conflict of interest adversely affected the performance of his lawyers.[328] Petitioner cannot establish that he was prejudiced at any rate.

■ A personal restraint petition may not raise an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of the issue.[329] The interests of justice allow relitigation of an issue raised on direct appeal if there has been an intervening change in the law or some other justification for not raising a crucial point or argument on direct appeal.[330] A personal restraint petition should not simply reiterate issues finally resolved at trial and on direct review.[331] The petition must instead raise new points of fact and law.[332]

Petitioner raises no new points of fact or law and simply attempts to convert an argument previously made into a claim of ineffective assistance of counsel. He may not raise the conflict of interest issue in this personal restraint petition because we have previously ruled on it.

### WASHINGTON'S DEATH PENALTY AS A VIOLATION OF THE EIGHTH AMENDMENT

*ISSUE (16). Whether Petitioner's sentence of death was imposed arbitrarily, capriciously, and discriminatorily because of his indigence and race in violation of the cruel and unusual punishment clause of the eighth amendment to the United States Constitution.*

Petitioner, citing *Furman v. Georgia*,[333] claims the "death penalty as administered in the State of Washington is cruel and unusual punishment because it is arbitrary, capricious,

---

[328] *Id.* at 865.

[329] *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 445, 21 P.3d 687 (2001).

[330] *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388, 972 P.2d 1250 (1999).

[331] *Id.*

[332] *Id.* at 388-89.

[333] 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

and discriminates against ethnic minorities and the poor."[334]

■ The eighth amendment to the United States Constitution, applicable to the states through the fourteenth amendment, provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The prohibition against "cruel and unusual punishment" is interpreted in light of " 'evolving standards of decency that mark the progress of a maturing society.' "[335]

Relying on *Furman*, United States Supreme Court Justice Antonin Scalia, concurring in *Walton v. Arizona*, stated that "a sentencer's discretion to return a death sentence must be constrained by specific standards, so that the death penalty is not inflicted in a random and capricious fashion."[336] In *Furman*, the United States Supreme Court "overturned the sentences of two men convicted and sentenced to death in state courts for murder and one man so convicted and sentenced for rape, under statutes that gave the jury complete discretion to impose death for those crimes, with no standards as to the factors it should deem relevant."[337] The per curiam opinion[338] concluded that "the imposition and carrying out of the death penalty in these cases constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments."[339] Because of *Furman*, states were required "to focus their

---

[334] Pet'r's Am. Pers. Restraint Pet. at 144.

[335] *Atkins v. Virginia*, 536 U.S. 304, 312, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958)).

[336] 497 U.S. 639, 657, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990) (Scalia, J., concurring) (citing *Furman*, 408 U.S. 238), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

[337] *Id.* at 657-58.

[338] The opinion of five Justices formed the majority, each of whom wrote separately and none of whom joined any other's opinion.

[339] *Furman*, 408 U.S. at 239-40.

death penalty statutes more narrowly so the discretion of the jury was channeled."[340]

▆▆▆ Under the Eighth Amendment, the capital sentencing process "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."[341] This narrowing can be accomplished by either limiting the definition of capital crimes or by broadly defining capital crimes but requiring additional aggravating facts in the *penalty phase* to justify a sentence of death.[342] Additionally, an aggravating circumstance may not be so generic that it could apply to all murders and it may not be so vague that it provides inadequate guidance to the sentencer.[343]

In *In re Brown* we stated:

> Under the Eighth Amendment, the "sentencing scheme must not allow the death penalty to be wantonly or freakishly imposed, it must direct and limit jury discretion, to minimize the risk of arbitrary or capricious action, and it must allow particularized consideration of relevant aspects of the character and record of each defendant, and the circumstances of the offense, before imposition of the sentence."[[344]]

Petitioner argues that "the absence of adequate defense resources continues to mean that the death penalty continues to be administered in a manner that is arbitrary, capricious, discriminatory, and unfair."[345] He also argues that he was "represented by lawyers who were unqualified,

---

[340] *Pirtle*, 127 Wn.2d at 684 (citing *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)).

[341] *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983); *Lowenfield v. Phelps*, 484 U.S. 231, 243, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988).

[342] *Lowenfield*, 484 U.S. at 245.

[343] *Tuilaepa v. California*, 512 U.S. 967, 969-70, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994).

[344] *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 460, 21 P.3d 687 (2001) (quoting *State v. Dodd*, 120 Wn.2d 1, 13 n.2, 838 P.2d 86 (1992)).

[345] Pet'r's Am. Pers. Restraint Pet. at 147-48.

overworked, and disinterested in his case."[346] There is no showing by Petitioner how the sentencing scheme relating to the death penalty in Washington violated the cruel and unusual punishment clause of the eighth amendment to the United States Constitution.

In responding to a similar argument, we stated in *In re Brown* that "[i]mposition of the death penalty . . . was not arbitrary because of 'budgetary constraints' nor for any other reason."[347] Similarly, in this case the record does not support Petitioner's claim of cruel and unusual punishment because of his indigence. During the *guilt phase* and *penalty phase* of his trial, Petitioner was provided at State expense two experienced and competent attorneys to present his defense. He had the services of four investigators, five medical experts, and other defense experts.

Petitioner also contends the death penalty as administered in Washington is cruel and unusual because it discriminates against ethnic minorities. In his reply brief, he submits racial statistics purporting to illustrate that "Washington's death sentencing appears to follow the pattern of death sentences imposed more frequently when the defendant is nonwhite and the victim is white, and never, or almost never, when the racial equation is reversed."[348]

A similar argument was rejected by the United States Supreme Court in *McCleskey v. Kemp*.[349] In a challenge to a death sentence based on a statistical study of the relationship between the death penalty and the races of murder victims and defendants, the court stated that "absent a showing that the [state] capital punishment system oper-

---

[346] *Id.* at 148.

[347] *In re Brown*, 143 Wn.2d at 460.

[348] Pet'r's Reply Br. at 68.

[349] 481 U.S. 279, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987).

ates in an arbitrary and capricious manner," the defendant could not establish an Eighth Amendment violation.[350]

Petitioner has not established his claim merely by citing general statistics. He concedes they do not purport to be conclusive proof of race discrimination.

### PERSONAL RESTRAINT PETITION PROCEDURES AS A VIOLATION OF DUE PROCESS

*ISSUE (17). Whether the discovery and time limit rules governing collateral attack by personal restraint petition on a criminal conviction and sentence violate the due process clause of the fourteenth amendment to the United States Constitution.*

 Petitioner's final claim for relief is that the rules governing collateral attack by personal restraint petition on a criminal conviction and sentence violate the due process guaranty of fundamental fairness under the fourteenth amendment to the United States Constitution. He argues that he is unable "to present facts in support of his petition that are admissible under the rules of evidence . . . either because this Court refuses to provide him with necessary funding, or because he has no means to compel witnesses to supply the kind of declarations that are required by" precedent.[351] He contends that "[t]he threshold showing required under RAP 16.26 and 16.27 is unreasonably high"[352] and that "[t]he same degree of unfairness inheres in the time limits for filing the personal restraint petition."[353]

Petitioner's claim that Washington's postconviction procedures violate due process is unpersuasive. Even though a defendant has no constitutional right to either counsel or discovery in making a collateral attack, our statutes and

---

[350] *McCleskey*, 481 U.S. at 306-07; *see also State v. Woods*, 143 Wn.2d 561, 619, 23 P.3d 1046 (2001) (rejecting a claim that the death penalty was imposed as a result of passion or prejudice).

[351] Pet'r's Am. Pers. Restraint Pet. at 151.

[352] *Id.*

[353] *Id.* at 152.

our court rules nevertheless afford a defendant with both.[354] RCW 10.73.150 provides that:

> Counsel shall be provided at state expense to an adult offender convicted of a crime . . . when the offender is indigent or indigent and able to contribute as those terms are defined in RCW 10.101.010 and the offender:
>
> . . . .
>
> (3) Is under a sentence of death and requests counsel be appointed to file and prosecute a motion or petition for collateral attack as defined in RCW 10.73.090. Counsel may be provided at public expense to file or prosecute a second or subsequent collateral attack on the same judgment and sentence, if the court determines that the collateral attack is not barred by RCW 10.73.090 or 10.73.140.[355]

Our court rules provide for discovery and investigative and expert services. The minimum showing required under both rules is not "unreasonably high." Under RAP 16.26, a person sentenced to death is entitled to discovery while pursuing a collateral attack if the person establishes facts that give rise to a substantial reason to believe the discovery will produce information which would provide grounds for relief under RAP 16.4(c). RAP 16.26 provides that:

> (a) Before or after a person under sentence of death files a personal restraint petition, the Supreme Court, on motion of that person, may order discovery. To obtain such an order, the person under sentence of death must establish facts that give rise to a substantial reason to believe that the discovery will produce information that would support relief under RAP 16.4(c). Information in support of the request that the person under sentence of death believes is privileged may be separated into a second confidential affidavit which identifies the asserted privilege with specificity and the law supporting the assertion of the privilege. Any affidavit which does not contain confidential information and the motion must be served on the prosecutor. The procedure for and form of the motion is as provided

---

[354] *See, e.g.,* RCW 10.73.150; *see also In re Gentry,* 137 Wn.2d at 390.

[355] RAP 16.25 provides for the appointment of counsel "to assist in preparing and presenting a first personal restraint petition."

in RAP Title 17. Motions will ordinarily be considered without oral argument. Prior to ruling on the motion, the Court will review the confidential affidavit to determine whether the contents therein are protected by the asserted privilege. If the asserted privilege does not apply, the court will serve the State with a copy of the confidential affidavit at least five working days before the State's response to the motion is due.

**(b)** After a person under sentence of death has filed a personal restraint petition, the Supreme Court, on motion of the State, may order discovery. To obtain such an order, the State must establish facts that give rise to a substantial reason to believe that the discovery will produce information that would support the denial of relief under RAP 16.4(c).

**(c)** Discovery conducted pursuant to this rule shall be governed by the civil rules, unless otherwise ordered by the court.

**(d)** In the event a remand hearing is ordered, discovery shall be governed by RAP 16.12.

**(e)** Discovery may be allowed for preparation of a second or subsequent petition attacking the same judgment and sentence only upon a substantial showing that the petition is not barred by RCW ch. 10.73 or RAP 16.4(d).

RAP 16.27 provides for investigative and expert services during a collateral attack for a person under sentence of death:

Before or after the filing of a personal restraint petition, a person under sentence of death may file a motion for investigative, expert, or other services. Such a motion shall be granted only if the person establishes facts that give rise to a substantial reason to believe that the services will produce information that would support relief under RAP 16.4(c), and if the legislature has authorized and approved funding for such services. The motion shall be directed to the Supreme Court and may be made ex parte. Upon a showing of good cause, the moving papers may be ordered sealed by the court and shall remain sealed until further order of the court. Services may be allowed for preparation of a second or subsequent petition attacking the same judgment and sentence only upon a substantial showing that the petition is not barred by RCW ch. 10.73 or RAP 16.4(d).

■ The one-year time limit for filing a personal restraint petition "imposes a constitutionally valid 'time limit' as a means of controlling the flow of postconviction collateral relief petitions."[356]

Petitioner's claim that this State's collateral relief procedures for capital murder cases violate constitutional provisions is without merit.

## SUMMARY

In this collateral attack by personal restraint petition, Petitioner raises 17 issues, primarily focusing on a claim of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, he must show both deficient performance and resulting prejudice. He also argues that Washington's death penalty statutes allow cruel and unusual punishment in violation of the eighth and fourteenth amendments to the United States Constitution and that Washington's postconviction procedures for capital cases offend due process in violation of the fourteenth amendment to the United States Constitution.

To obtain relief on collateral review based upon a constitutional error, Petitioner must demonstrate by a preponderance of the evidence that he was actually and substantially prejudiced by the error.

We reach the following conclusions in responding to the 17 issues raised by Petitioner:

ISSUE 1. Petitioner cannot establish prejudice from his counsel's decision not to object to his being shackled during the *guilt phase* and *penalty phase* of his trial. Because of the overwhelming evidence of Petitioner's guilt, he cannot show there was a reasonable probability that, *but for* his counsel's deficient performance by failing to object, the outcome of his trial would have been different. However, because in the penalty phase the focus is no longer on guilt, but rather on the defendant's character and future dangerousness, the

---

[356] *Shumway v. Payne*, 136 Wn.2d 383, 399, 964 P.2d 349 (1998).

balance tips in Davis' favor and we remand for a new trial on the penalty phase.

*ISSUE 2.* An "interracial crime" involving an African American male and an Asian/Japanese American female, without more, does not mean that counsel's performance was deficient by not inquiring during voir dire into racial bias of prospective jurors.

*ISSUE 3.* Performance is not deficient because counsel did not move to sever the trial from Petitioner's codefendant's trial based on antagonistic defenses because Petitioner cannot show that the trial court would have granted the motion.

*ISSUE 4.* Performance is not deficient when counsel's decision not to object to comments introduced into evidence can be characterized as legitimate trial strategy or tactics.

*ISSUE 5.* Forgoing an opening statement can be characterized as a tactical decision within an objective standard of reasonableness under prevailing professional norms and is therefore not deficient representation.

*ISSUE 6.* Defense counsel's performance is not below standard and unprofessional when counsel refrains from objecting during the prosecutor's closing argument because it is uncommon for lawyers to object during closing argument absent egregious misstatements.

*ISSUE 7.* Petitioner was not prejudiced by trial counsel's decision not to extensively cross-examine a witness concerning a statement she had made to police authorities concerning her mother's missing wedding ring because Petitioner cannot show how the witness' testimony could have overcome the overwhelming evidence against him.

*ISSUE 8.* Defense counsel's decision not to present a mental illness defense was well within an objective standard of reasonableness under prevailing professional norms. Counsel retained five mental health experts and conducted a thorough pretrial investigation into the possibility that a mental illness defense could be used at trial. Ultimately, counsel decided to forgo a mental illness de-

fense because of skepticism about the evidence supporting such a defense, an expert's conclusion that Petitioner was presenting himself as being more impaired than he actually was, and Petitioner's insistence upon not adopting any defense requiring him to admit killing Ms. Couch. The psychologist, on whom counsel relied, was qualified to render an opinion whether Petitioner suffered from mental illness.

*ISSUE 9.* Contrary to Petitioner's claim, defense counsel did submit adequate psychological evidence during the *penalty phase* of his trial. The main focus of Petitioner's mitigating evidence was given in testimony by two competent and qualified mental health experts.

*ISSUE 10.* Petitioner's defense attorneys conducted exhaustive pretrial investigations and presented substantial mitigating evidence during the *penalty phase,* including evidence of Petitioner's troubled childhood, family problems, substance abuse, capacity to serve his jail term errant-free, and his psychological makeup.

*ISSUE 11.* Petitioner was not prejudiced by his counsel's decision not to interview Shelbey B. Johnson, a jailhouse informant, before he testified that Petitioner admitted killing Ms. Couch because counsel effectively cross-examined and impeached Mr. Johnson when he testified.

*ISSUE 12.* Counsel's decision not to retain an expert to observe the scientific testing of blood evidence was a tactical decision not amounting to deficient representation. Petitioner does not show how an expert would have altered the outcome of his trial.

*ISSUE 13.* Despite Petitioner's assertion to the contrary, counsel advanced two plausible alternative theories of defense—reasonable doubt and felony murder. Choosing a particular defense is a strategic decision evaluated from counsel's perspective at the time of the decision and considering all the circumstances. Petitioner maintained his innocence and directed his attorneys not to pursue any defense requiring an admission that he killed Ms. Couch.

*Issue 14.* Counsel's decision not to object to admission of certified copies of a judgment and sentence indicating an exceptional sentence, verdict forms, and municipal court docket entries to prove Petitioner's prior criminal activity did not fall below an objective standard of reasonableness under prevailing professional norms. Admission of these documents at the *penalty phase* of the trial was proper.

*Issue 15.* Petitioner's claim that a conflict of interest existed between him and his attorneys was raised and rejected on direct appeal. Petitioner simply attempts to convert his argument previously made into a claim of ineffective assistance of counsel. He may not raise the conflict of interest in this personal restraint petition because we have previously ruled on it.

*Issue 16.* Under the eighth and fourteenth amendments to the United States Constitution, a sentencing scheme which is vague or arbitrarily imposed constitutes cruel and unusual punishment. But in this case Petitioner has not established that Washington's death penalty sentencing scheme is either vague or arbitrarily imposed. Nor has he established his claim that our sentencing scheme is wantonly and freakishly imposed against the poor and ethnic minorities. Imposition of the death penalty in this case was not based upon Petitioner's financial status or his race.

*Issue 17.* Petitioner's claim that Washington's postconviction procedures violate the due process guaranty of fundamental fairness under the fourteenth amendment to the United States Constitution is unpersuasive. Even though a defendant has no constitutional right to either counsel or discovery in a collateral attack by personal restraint petition on a criminal conviction and sentence, Washington provides a defendant with both. The showing required for discovery and investigative or expert services is not unconstitutional. The one-year time limit for filing a personal restraint petition is not unconstitutional.

## CONCLUSION

Petitioner Cecil Emile Davis has not established that he suffered actual prejudice from constitutional error committed by his counsel in providing him ineffective assistance in the *guilt phase* of his case, but we grant the petition and remand for a new *penalty phase*. He has not established his other claims.

ALEXANDER, C.J., and JOHNSON, BRIDGE, OWENS, and FAIRHURST, JJ., concur.

MADSEN, J., concurs in the result.

CHAMBERS, J. (concurring) — I concur that there was no established justification for placing Cecil Davis in restraints during the trial. But under our jurisprudence, it is per se reversible error in a death penalty sentencing if the trial court (1) fails to go through the proper procedures before restraining a defendant, and (2) the restraints become apparent to the jury. The jury was required by law to consider whether Davis was dangerous when deciding whether he was deserving of death. *See* RCW 10.95.070(8). The sight of unjustified restraints fatally taints this deliberation. *E.g., State v. Finch*, 137 Wn.2d 792, 842, 846, 975 P.2d 967 (1999).[357]

Constitutional errors in criminal trials are extremely troubling. Arguably, they violate the compact between the citizen and the State and deprive the accused of a fair trial. Arguably, many errors, even constitutional ones, are harmless. We have long struggled with the appropriate approach

---

[357] As the United States Supreme Court wrote:

> Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at the trial. But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.

*Illinois v. Allen*, 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970).

to their review. *E.g.*, *State v. Borrero*, 147 Wn.2d 353, 58 P.3d 245 (2002) (plurality of a starkly divided court applies constitutional harmless error analysis to instructional errors); *State v. Brown*, 147 Wn.2d 330, 58 P.3d 889 (2002) (plurality notes some constitutional instructional errors require reversal per se); *see also Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); *cf. State v. Norman*, 145 Wn.2d 578, 40 P.3d 1161 (2002) (dispute over the plain language of the state constitution in light of advancing technology). Some justices approach these cases as if any constitutional error probably rendered the trial fundamentally defective. Other justices approach these cases with the faith that almost any error can be harmless. We return to this struggle again and again.

I do not think this divide is a bad thing. It helps the court's deliberation by airing both points of view in the context of specific claims of constitutional error and makes us regularly revisit claims of justice, pragmatism, and absurd formalism.

But we have already settled whether we must vacate a death sentence when the defendant is improperly restrained and when that fact comes to the attention of the jury. The majority has shown no compelling reason to part with our jurisprudence, nor any compelling way that this case is distinguishable from *Finch*, where we vacated a death sentence for this very reason. *Finch*, 137 Wn.2d at 842; *see also State v. Berlin*, 133 Wn.2d 541, 547, 947 P.2d 700 (1997) (cases must be both incorrect and harmful before they may be overruled).

This rule makes sense. Not only does it give appropriate weight to the gravity of this error, it also puts the incentives in the right place. A defense counsel already has a strong incentive to have his or her client appear before the jury without restraints because of their prejudicial effect. *See generally Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). With this rule in place, the prosecution will also have a strong incentive to ensure that a proper hearing is held before the defendant is restrained, and the

least visible and intrusive restraints are used to ensure that this issue does not arise on review.

I emphasize that *had* the trial court properly determined that the restraints were necessary after following the appropriate procedures, and *had* the least visible and least restrictive means of effective restraint been used, this may not have been reversible error. It would not have been "unconstitutional shackling," raising the heightened concerns articulated in *Finch* and *State v. Clark*, 143 Wn.2d 731, 774-77, 24 P.3d 1006 (2001). Indeed, it might not have been error at all. *Cf. United States v. Mayes*, 158 F.3d 1215, 1226 (11th Cir. 1998). Under those circumstances, had the shackles been unveiled by a stray gust of wind or wayward wheeled briefcase, the State should be allowed to demonstrate, beyond a reasonable doubt, that the error did not deprive Davis of a fair sentencing hearing. *Cf. Neder*, 527 U.S. at 8; *Clark*, 143 Wn.2d at 776-77. However, given the gravity of sentencing errors in capital cases, this court should err on the side of finding prejudice. *Cf. State v. Benn*, 120 Wn.2d 631, 660, 845 P.2d 289 (1993).[358]

This comes to us as a personal restraint petition, and the burden is on the petitioner to show prejudice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 812, 792 P.2d 506 (1990). But under *Finch*, and to give due weight to the extraordinary importance of the Sixth Amendment's guaranty of a fair trial, especially in capital sentencing, the petitioner meets his initial burden by demonstrating he was shackled without the appropriate procedural safeguards, and that the shackles were visible to the jury. *Cf. Allen*, 397 U.S. at 344; *see generally Crawford v. Washington*, 541 U.S. 36, 42,

---

[358] Even if I were to agree with the majority that some sort of independent review of the evidence is appropriate, I am not persuaded that *Strickland* and its progeny put forth the proper analysis. *Strickland v. Washington*, 466 U.S. 668, 695, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (establishing reasonable probability of harm standard); *cf.* majority at 704-05 (same). *Strickland* was about ineffective assistance of counsel, and prevailing on an ineffective assistance of counsel claim always requires showing likely harm. This unlawful shackling goes to the very question the jury was required to consider and tainted its ability to do so. We should impose a higher standard given the type of error. *Cf. Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (effectively imposing higher standard on errors that go to the evidence presented to the jury).

124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (rejecting a lenient approach to the requirements of the Sixth Amendment because "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty."). Shackles communicated to the jury that Davis was extraordinarily dangerous, and that is improper. *See* RCW 10.95.070(8) (instructing a jury impaneled to consider a death penalty to consider whether the defendant is dangerous); *Finch,* 137 Wn.2d at 849-51 (*noting that shackles strongly imply dangerousness*).

With that reservation, I concur with the majority.

SANDERS, J. (concurring in part, dissenting in part) — The majority correctly remands Cecil Emile Davis's case for a new penalty trial because the trial court unconstitutionally ordered him to appear before the jury in leg restraints (i.e., shackles) during sentencing. However, the majority stops short. Davis's conviction must be reversed because he was also unconstitutionally shackled during the guilt phase of his trial.[359] While recognizing the clear constitutional error of the shackling, the majority fails to apply the correct standard to determine the prejudicial effect of that error.

The majority acknowledges, as it must, there was no justification for the trial court's order requiring Davis to be shackled during the guilt and penalty phases of his trial. *See* majority at 676-77, 694-95, 699 n.135. This is so because, although the majority relegates this essential point to a one sentence statement in a footnote, *see id.* at 699 n.135, the trial court failed to conduct an individualized

---

[359] The majority disagrees that the trial court ordered Davis to be shackled because Judge Fleming never ordered it when the case was reassigned to him following the mistrial. Majority at 700 n.138. However, after Judge Hayes declared the mistrial (Nov. 13, 1997), Judge Sebring decided to transfer the case back to the court for reassignment (Nov. 24, 1997). Clerk's Papers (CP) at 512, 520. He considered the transfer to have the same legal effect as a recusal. *Id.* at 520. Judge Sebring specifically said, "The prior orders and rulings I have made all remain in effect, unless or until modified by the new trial judge." *Id.* Judge Fleming never modified the shackling order. The majority's claim the trial court did not order Davis to be shackled is simply wrong.

assessment of the need for shackling, a constitutional requirement recognized by this court to shackle a defendant during trial, *see State v. Finch*, 137 Wn.2d 792, 846-54, 975 P.2d 967 (1999); *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981). The majority claims, however, the unconstitutional shackling of Davis did not prejudice him as to the jury's finding of guilt because the record reveals "overwhelming evidence" of his guilt. Majority at 700. Bewilderingly, the majority also asserts the impermissible shackling does not warrant reversal of Davis's conviction because only one juror saw him wearing shackles in the courtroom during the guilt phase of the trial. *Id.* at 704-05.[360]

The majority misses the mark. The final measure of error in a criminal trial is whether the defendant was afforded a fair trial, not whether the appellate court agrees with the

---

[360] I also note the majority's discussion of Davis's shackling claim is needlessly confusing. A careful review of the briefs demonstrates his claim is far more straightforward than the majority makes it.

In his amended personal restraint petition, Davis asserts he was deprived of his right to due process and a fair trial by forcibly being shackled throughout trial and posttrial proceedings. Am. Pers. Restraint Pet. at 26-31. The State responded by arguing, among other things, that Davis waived his shackling claim by failing to raise a proper objection with the trial court. State's Resp. to Pers. Restraint Pet. at 77-81. Davis countered that he did properly object to his being shackled but he argued in the alternative that a failure to properly object would nonetheless constitute ineffective assistance of counsel. Pet'r's Reply Br. at 9-11.

The threshold issue then is whether Davis waived his shackling claim by failing to properly object to the trial court's order that he be shackled. If he did not waive the claim, this court must reach the merits of his claim as presented in his amended personal restraint petition. If he did waive the claim, this court must resolve the shackling issue in the context of Davis's claim of ineffective assistance of counsel. The majority ostensibly does both, although it specifically does not decide whether Davis waived his shackling claim. *See* majority at 700.

The majority acknowledges Davis properly objected to Judge Sebring's order requiring him to wear shackles during trial proceedings. *See id.* at 676, 699. The majority also concedes Judge Sebring explicitly advised counsel his orders and rulings would all " 'remain in effect, unless or until modified by the new trial judge.' " Majority at 700 (quoting CP at 520). There is nothing in the record or elsewhere indicating Davis was somehow required to object again to the same order when the case was transferred to Judge Fleming. As such, Davis did not waive his shackling claim and any discussion regarding ineffective assistance of counsel in this context is inappropriate.

The majority mistakenly claims the dissent asserts a per se rule for ineffective assistance of counsel on the issue of shackling. Majority at 674 n.34. The dissent does not address the ineffective assistance of counsel claim because Davis did not waive the shackling claim. Ineffective assistance of counsel is not an issue.

jury's verdict. *State v. Green*, 71 Wn.2d 372, 373, 428 P.2d 540 (1967). This court has long recognized:

[I]t is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors. The state attempts to safeguard the life and liberty of its citizens by securing to them certain legal rights. These rights should be impartially preserved. They cannot be impartially preserved if the appellate courts make of themselves a second jury and then pass upon the facts.

*State v. Robinson*, 24 Wn.2d 909, 917, 167 P.2d 986 (1946).

A criminal defendant has the constitutional right to appear at trial free from shackles or other physical restraints, except in extraordinary circumstances. *Illinois v. Allen*, 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970); *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999); *Finch*, 137 Wn.2d at 842. This right is an essential component of a fair and impartial criminal trial, guaranteed by the sixth and fourteenth amendments to the United States Constitution and article I, section 3, and article I, section 22 of the Washington State Constitution. *Finch*, 137 Wn.2d at 843. The Supreme Court has clearly stated "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978).

Requiring a defendant to appear at trial in physical restraints poses a substantial risk of destroying the defendant's presumption of innocence, " 'a basic component of a fair trial under our system of criminal justice.' " *Finch*, 137 Wn.2d at 844 (quoting *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976)). Shackles unmistakably indicate the court believes there is a "need to separate a defendant from the community at large, creating an inherent danger that the jury may form the impression that the defendant is dangerous or untrustworthy." *Rhoden*, 172 F.3d at 636 (citing *Holbrook v. Flynn*, 475 U.S. 560,

568-69, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986)). This is particularly true where the defendant is accused of a violent crime because the sight of the defendant in shackles is likely to not only lead jurors to believe the defendant is a violent person but also that he or she is disposed to commit the type of acts alleged. *Finch*, 137 Wn.2d at 845 (citing *People v. Duran*, 16 Cal. 3d 282, 290, 545 P.2d 1322, 127 Cal. Rptr. 618 (1976)). Furthermore, shackling hinders a defendant's ability to assist in his or her defense and is offensive to the dignity of the judicial process. *Id.* at 846.

It is indeed true, as the majority points out, this court has held unjustified shackling harmless under certain circumstances. Majority at 695-97 (citing *State v. Clark*, 143 Wn.2d 731, 775-76, 24 P.3d 1006 (2001); *Finch*, 137 Wn.2d at 862). But contrary to the majority's assertion, the prejudicial effect of shackles cannot be determined by evaluating the evidence presented to the jury. This is because the presence of shackles has a subliminal effect and "jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused." *Holbrook*, 475 U.S. at 570.

When determining the effect of impermissible shackling on a jury's verdict, our overarching concern is its impact "on the presumption of innocence." *Clark*, 143 Wn.2d at 776. To that extent, the prejudice that may result from requiring a defendant to wear shackles during trial turns on the degree to which the jury could detect the defendant was in shackles during trial proceedings. *See, e.g., Rhoden*, 172 F.3d at 636-37 (holding erroneous shackling not harmless where five jurors saw defendant in shackles during proceedings and two jurors remembered other jurors making comments to them about the shackles); *Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir. 1989) (holding erroneous shackling not harmless where shackles were conspicuous); *see also Duckett v. Godinez*, 109 F.3d 533, 535 (9th Cir. 1997) (holding erroneous shackling harmless where shackles not visible to jury); *United States v. Olano*, 62 F.3d 1180, 1190 (9th Cir. 1995) (holding erroneous shackling harmless where only a possi-

bility some jurors saw defendant in shackles outside courtroom); *State v. Damon*, 144 Wn.2d 686, 693, 25 P.3d 418 (2001) (holding erroneous use of restraint chair during trial was not harmless where jury "must have observed" defendant in chair); *Clark*, 143 Wn.2d at 776 (discussed *infra*); *State v. Elmore*, 139 Wn.2d 250, 274-75, 985 P.2d 289 (1999) (holding erroneous shackling on first day of voir dire harmless where defendant was not shackled during trial).

In *Clark* we held there was no actual prejudice requiring reversal of the defendant's conviction where he appeared unrestrained throughout the trial but was restrained on the first day of voir dire and the day the verdict was read. *Clark*, 143 Wn.2d at 776. We reasoned the defendant's "shackling on the first day of voir dire was more than logically offset by over two weeks of observing [him] in the courtroom without shackles" and "the presumption of innocence was [no longer] at stake on the day the verdict was read." *Id.* In *Clark* we did not attempt to second-guess the jury by independently weighing the evidence pertaining to the guilt or penalty phases.

In *Dyas v. Poole*, 317 F.3d 934, 938 (9th Cir. 2002), the Ninth Circuit affirmed a district court order conditionally granting a writ of habeas corpus to a defendant who had been unconstitutionally shackled during her trial. The California Court of Appeal previously held the shackling violated the defendant's right to a fair trial but held the error harmless because the trial court determined none of the jurors could see the shackles from the jury box. *Id.* at 936. The defendant subsequently filed a petition for habeas corpus in federal district court, prompting the magistrate judge to conduct an evidentiary hearing to determine whether any juror actually saw the defendant in shackles. *Id.* One of the jurors and a prospective juror testified at the evidentiary hearing that they had seen the defendant in shackles from the jury box. *Id.* On the magistrate judge's recommendation, the district court granted the defendant's writ. *Id.*

The Ninth Circuit affirmed, holding "[p]rejudice is particularly likely here because at least one juror saw Dyas's shackles during the trial from the jury box. It is likely that other jurors saw the shackles, but if even one juror is biased by the sight of the shackles, prejudice can result." *Id.* at 937 (citation omitted) (citing *Parker v. Gladden*, 385 U.S. 363, 366, 87 S. Ct. 468, 17 L. Ed. 2d 420 (1966) (noting "a defendant is 'entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors' ")). Furthermore, the court reasoned the defendant was charged with a violent crime, "increasing the risk that 'the shackles essentially branded [her] as having a violent nature.' " *Id.* (alteration in original) (quoting *Rhoden*, 172 F.3d at 637).

Here Davis was unconstitutionally shackled throughout both the guilt and penalty phases of his trial. He was also charged with a violent crime, aggravated first degree murder. Evidence presented at the reference hearing demonstrates that at least one juror (Michael Buchanan) actually saw Davis in shackles on two occasions during the guilt phase of the trial. Verbatim Report of Proceedings (VRP) at 154-55, 173. This juror remembered seeing the shackles even though the reference hearing was nearly five and a half years after the trial. *See Rhoden*, 172 F.3d at 637 (finding significant that jurors at evidentiary hearing six years after trial remembered seeing defendant in shackles). There is a very strong likelihood at least two other jurors (Karen Dasher and the unnamed juror who made a comment to Dasher in the jury room about shackles) were also aware Davis was in shackles. *See* VRP at 359, 379. To make matters worse they had a conversation about shackles in the jury room with other jurors around. VRP at 379. Under these facts it cannot be doubted that the impermissible shackling of Davis " 'had substantial and injurious effect or influence in determining the jury's verdict' " and consequently was not harmless. *Rhoden*, 172 F.3d at 637 (quoting

*Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).[361]

The majority does not rely upon the testimony of jurors Buchanan, Dasher, and Ed Nelson, each of whom stated that his or her knowledge of the shackles did not affect his

---

[361] Although perhaps not dispositive, the majority opinion contains a glaring inaccuracy that must be corrected for the record. The majority asserts "the trial court's finding that Juror Nelson did not see Davis in leg restraints is supported by substantial evidence." Majority at 685. According to the majority, the supposed *substantial evidence* is derived from the fact that Nelson allegedly testified "the only time" he saw Davis wearing shackles was in a hallway "during a transfer from 'an elevator through a hallway into a larger courtroom.' " *Id.* at 684 (quoting VRP at 604). The majority then claims Davis "concedes that the trial court's finding that no juror saw Davis being transported from the freight elevator was accurate." *Id.* at 685. That concession, coupled with a befuddling discussion of whether Nelson did or did not see "someone" in "handcuffs," according to the majority, leads to the conclusion that the trial court correctly found juror Nelson did not see Davis in *leg restraints*. *Id.* at 685. This is incorrect. It is also inconsistent with the majority's own footnote 76, upon which I will try to shed some light.

The trial court's finding Davis challenges here is the finding that "[j]uror Ed Nelson did not see [Davis] in leg restraints," CP at 256. Pet'r's Am. Suppl. Br. Regarding Shackling at 66. Nelson testified that while he and other potential jurors were waiting in a courthouse hallway prior to voir dire, he saw both Davis and his codefendant, George Anthony Wilson, being escorted into the courtroom in "standard restraints" around their "wrists and ankles." VRP at 597-98. He then testified about a prior written declaration he provided the State's investigator, Kenneth Swanson. VRP at 602-04. Nelson testified "[t]he only time I remember seeing them in shackles was during the transfer from *what must have been an elevator* through a hallway into a larger courtroom, and that's what is in the declaration." VRP at 603-04 (emphasis added). The majority seizes on Nelson's speculative statement about the possibility Davis had been brought from "an elevator" when Nelson saw him and Davis's concession that no juror saw him being transported from the freight elevator to conclude "the trial court's finding that juror Nelson did not see Davis in leg restraints is supported by substantial evidence." Majority at 685.

Whether Davis was being brought from the freight elevator or elsewhere is beside the point. Nelson testified repeatedly and unequivocally that he saw Davis in wrist and ankle restraints while Davis was being escorted into the courtroom prior to voir dire. VRP at 597-98, 603-04, 612. In response to a question by the State during cross-examination, Nelson declared:

A: You know, I have been asked these questions about nine different ways, and if you want me to remember exactly what one person asked me at one time, it's going to be a little difficult.

. . . .

I have been asked several times whether I remember seeing them shackled in the courtroom. I said no. The only time I remember handcuffs or shackles is in the hallway downstairs on the main floor for a brief period of time.

VRP at 612. As such, the trial court's finding that Nelson did not see Davis in leg restraints is erroneous.

or her decision. However, the majority suggests that such testimony could be probative if it were not so remote. Majority at 689. The jurors' subjective beliefs are irrelevant to this court's ultimate determination of prejudice. *See Dyas*, 317 F.3d at 937. In *Dyas* the state of California responded to Dyas's claim of unconstitutional shackling by arguing any possible prejudice arising from seeing her in shackles was eliminated because the jurors stated during voir dire that seeing her in shackles on her way to and from the courtroom would not have any effect on them. *Id*. The Ninth Circuit rejected the State's argument noting the Supreme Court has recognized " 'little stock need be placed in jurors' claims' that they will not be prejudiced." *Id*. (quoting *Holbrook*, 475 U.S. at 570). The court further noted where visible shackling is at issue " 'the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play.' " *Id*. at 937-38 (quoting *Holbrook*, 475 U.S. at 570). The court granted Dyas relief reasoning that "[t]he analysis . . . must focus on whether the risk was there, not whether the jurors could recognize the risk." *Id*. at 938. The majority's suggestion the subjective beliefs of jurors could be probative is misguided, and could lead to devastating results.

The majority's conclusion that Davis's shackling had no effect on the jury's guilty verdict is contrary to state and federal law. Davis's visible and unjustified shackling destroyed his presumption of innocence and right to a fair trial. A prejudicial constitutional error such as this cannot be tolerated.

The majority correctly reverses Davis's sentence but fails to take the next logical step. Davis's personal restraint petition should be granted in full, his conviction and death sentence reversed, and the case remanded for a new trial.